THE PEOPLE ex rel. Moloney, Attorney General,

v.

THE PULLMAN'S PALACE CAR COMPANY.

*Opinion filed October 24, 1898.*

1. PLEADING—*a special traverse distinguished from common traverse.* The purpose of a special traverse is to explain or qualify the denial, and the essential parts thereof are the inducement, the denial and the verification.

2. SAME—*the issuable part of a special traverse is the denial.* The issuable part of a special traverse is the denial under the *absque hoc,* and if the denial is sufficient no issue of fact can be formed upon the inducement, provided the latter is such as in itself amounts to a sufficient answer to the averments traversed by the plea.

3. SAME—*plaintiff may raise an issue of fact on the denial or an issue of law on the inducement.* Upon the filing of a special traverse the plaintiff may elect to form an issue of fact upon the denial under the *absque hoc* or to form an issue of law by demurring to the plea, thereby taking exception, in point of law, to the explanatory matter set up in the inducement.

4. SAME—*question presented by demurrer to special traverse.* Upon demurrer to a special traverse, the denial of which is sufficient, all material statements in the plea are admitted to be true, and the question presented is whether the matter stated in the inducement constitutes a valid answer and defense, in point of law, to the averments to which the plea relates.

5. CORPORATIONS—*rule for determining scope of corporate power is the same for general and special corporations.* Whether a corporation is created by general or special law, it may exercise only those powers expressly given it, and such other powers as are necessary to carry the express powers into effect.

6. SAME—*implied powers are those essentially incident to express powers.* Implied powers must be bounded by the purpose of the corporate existence and the terms of the charter, and acts which tend only by indirection to promote the interests and chartered objects of the corporation cannot be justified by implication, but are *ultra vires.*

7. SAME—*right of corporation to erect building for city office.* A manufacturing corporation having an out of town plant may, under a grant of power to acquire and hold such real estate as may be deemed necessary for the successful prosecution of its business, purchase a site and erect a building for city headquarters, of sufficient size to meet its probable future needs for office room, and may rent what is not needed for its immediate use.

8. SAME—*corporation cannot own an entire town or city.* A manufacturing corporation has no power, under a charter provision giving it authority to acquire and hold such real estate as may be deemed necessary for the successful prosecution of its business, to purchase, near a populous city, several hundred acres of open prairie as a site for its plant, and subdivide the land not occupied by the plant into lots and blocks, with streets, alleys and parks, erect houses, churches, school buildings, stores, and rent them, respectively, to employees, religious denominations, school boards and business men; nor can such action be sustained on the ground of expediency, or of necessity in providing its employees with shelter, educational advantages, markets, and places for worship and amusement. (CRAIG, WILKIN and CARTWRIGHT, JJ., dissenting.)

9. SAME—*public policy forbids that corporations own other than necessary real estate.* It is against the public policy of this State for a corporation to own real estate beyond what is necessary for the transaction of its business, and under our statutes real estate acquired by a corporation in collecting debts, etc., must be disposed of, if not necessary for its corporate purposes.

10. SAME—*one usurpation of power cannot justify further usurpations.* The *ultra vires* act of a corporation in building a city around its manufacturing plant cannot be made the basis of a claim that the corporation, having been obliged to put in a sewerage system, might lawfully, in order to utilize the sewerage, own a farm to which the sewerage was conveyed, and cultivate the same in the interests of the corporation, to help pay the expenses of the sewerage system. (CRAIG, WILKIN and CARTWRIGHT, JJ., dissenting.)

11. SAME—*right of a railway car company to sell wines and liquors to patrons.* A corporation authorized by its charter to manufacture, construct and purchase railway cars, with all convenient appendages and supplies for persons traveling therein, and to sell or use the same as the company may see fit, may, upon obtaining license, sell wines and liquors to its traveling patrons, such beverages being recognized as within the term "supplies."

12. SAME—*land need not be occupied by buildings, to be in use for corporate purposes.* A manufacturing corporation may lawfully own a tract of vacant land adjoining its plant, which it uses as a dumping ground for cinders and refuse from its shops, and which it expects to utilize in the future for further extensions of its plant.

13. SAME—*railway car company may own land which it expects to use for storing cars.* A corporation engaged in manufacturing railway cars, and having express authority to acquire and hold such real estate as may be deemed necessary, may purchase and hold a tract of land, detached from its shops and adjoining a belt railroad over which many of its cars are delivered for repairs, which it intends to use for tracks upon which to store its cars; and the fact that it

is able at present to obtain storage room from railroad companies does not affect its right to hold the property.

14. SAME—*a corporation may provide for future increase in business.* A manufacturing corporation may provide for the future growth of its business, and may place in its plant boilers of sufficient capacity to generate steam to provide for future enlargements of the plant, and may dispose of the steam not needed for immediate use to neighboring manufactories.

15. SAME—*right of corporation to become a stockholder in other corporations.* The right of a corporation to become a stockholder in other corporations can only be exercised when specifically granted by its charter or necessarily implied therefrom; nor, in the absence of such power, can one corporation hold stock in another, even though the latter, while existing as an independent corporation, is in fact a mere department or agency of the former.

16. SAME—*State not estopped by delay to question ultra vires acts of corporation.* Failure to invoke the aid of courts at an early day to prevent a corporation *de jure* from usurping powers not granted by its charter is not such acquiescence or *laches* on the part of the public as will work an estoppel.

APPEAL from the Circuit Court of Cook county; the Hon. FRANK BAKER, Judge, presiding.

MAURICE T. MOLONEY, Attorney General, (T. J. SCOFIELD, M. L. NEWELL, SAMUEL RICHOLSON, and GEORGE E. BACON, of counsel,) for the People.

JOHN S. RUNNELLS, and WILLIAM BURRY, for appellee.

Mr. JUSTICE BOGGS delivered the opinion of the court:

This is an information in the nature of a *quo warranto,* filed by the Attorney General in the circuit court of Cook county, in the name and on behalf of the People of the State of Illinois, against Pullman's Palace Car Company. Said company is a corporation, organized in 1867 by a special act of the legislature of Illinois, entitled "An act to incorporate Pullman's Palace Car Company." (2 Private Laws of 1867, p. 337.) That act is as follows:

."SECTION 1. *Be it enacted by the People of the State of Illinois, represented in the General Assembly:* That George M.

Pullman, John Crerar and Norman Williams, Jr., and their associates, successors and assigns, be and are hereby created a body politic and corporate, under the name and style of 'Pullman's Palace Car Company,' with all powers, rights, privileges and immunities incident to corporations and necessary or useful for the purposes of this act: *Provided*, that if the corporation created by this act shall not organize within one year after the passage hereof, then this act shall be null and void.

"Sec. 2. The capital stock of the said company shall be $100,000, and be divided into shares of $100 each, and it may be increased from time to time as a majority of the stockholders may direct, and shall be issued and transferred in such manner and under such conditions as the directors of the said company shall, by the by-laws thereof, prescribe.

"Sec. 3. That the corporate powers of the said company shall be vested in and exercised by a board of directors, consisting of such number of persons, not less than three nor more than seven, as the stockholders of the said company may, from time to time, direct. The said directors shall be chosen by the stockholders at such time and place as may be fixed by the by-laws of the said company, and shall hold their offices for one year and until their successors are elected and qualified. They shall elect one of their number president of said company, and may fill any vacancy in the said board, occasioned by death, resignation or otherwise, for the unexpired portion of the office so becoming vacant, and make such rules, by-laws and regulations, and appoint such officers and servants, as they may, from-time to time, deem expedient. Until, an election of directors as herein provided, the persons named as corporators in the first section of this act shall constitute a board of directors, and shall have and may exercise all the powers of such board.

"Sec. 4. The said corporation shall have power to manufacture, construct and purchase railway cars, with all

convenient appendages, and supplies for persons traveling therein, and the same may sell or use, or permit to be used, in such manner and upon such terms as the said company may think fit and proper.

"Sec. 5. The said corporation shall have power to borrow money, and may secure the payment of the same by deed of trust, mortgage or other security.

"Sec. 6. It may be lawful for the company hereby incorporated to purchase, acquire and hold such real estate as may be deemed necessary for the successful prosecution of their business, and may have power to sell and convey the same.

"Sec. 7. This act shall be deemed a public act, and shall take effect from and after its passage."

The information sets out the charter of the defendant, and then alleges certain acts which are alleged to be usurpations by the defendant of powers not conferred by its charter, and concludes with a prayer for the forfeiture of the charter of the corporation.

The allegations contained in the information of the usurpations of power on the part of the defendant are, in substance, as follows:

*First*—That it owns and controls a large ten-story business block, together with the ground on which it stands, worth two million dollars, in the business center of the city of Chicago; that it rents three-fourths of said block to persons, firms and corporations, and derives a large income therefrom; that this business block is located many miles from its works, or what is called the "Town of Pullman," and a small portion of it only is occupied by the company's employees; that this business block was built as an investment, and not because it had any real necessity therefor.

*Second*—That it owns fifty acres of ground at Pullman, Illinois, which are covered with two-story brick dwelling houses and three-story apartment buildings; that all these houses are rented by it, and it derives therefrom

175—9

large rentals; that the dwellings and apartment buildings so rented furnish homes for twelve thousand people, and are worth a large amount of money, and are usurpations of power on its part.

*Third*—That it owns fifty acres of ground in said town of Pullman which are used for streets, alleys and ornamental grounds, and that the same are very valuable, and that the owning of such lands for such purposes is a usurpation of power.

*Fourth*—That it owns fifteen acres of ground on which are erected, among other buildings, the Arcade Building, the Hotel Florence, and some school houses; that the Arcade Building is a large business block, and is rented by the company to different persons, and there is carried on therein various and different kinds of business by the tenants occupying the same, and that said Arcade Building yields a rich profit to said company.

*Fifth*—That it owns two churches in said town of Pullman, together with the ground on which they are erected, and it rents said church edifices to different congregations and derives a large profit therefrom.

*Sixth*—That it owns a number of school houses in said town, and the ground on which they are erected, and they are rented by it to the authorized educational authorities, and it derives a large income therefrom.

*Seventh*—That it owns a large hotel, located in said town, and which is known as the Hotel Florence; that said company operates and controls said hotel, and pays for the supplies consumed therein and for all help employed in and about said hotel; that it employs and pays a manager to look after said hotel, and in connection with said hotel it owns and operates a bar-room or saloon, and which saloon is located in said hotel building, and that in said saloon it sells all kinds of whiskies, intoxicating liquors and other drinks; that a government license is annually taken out for saloon purposes, and that the keeping and maintaining said hotel and the keeping and

maintaining said saloon are all done for profit, and a large income is derived therefrom.

*Eighth*—That it owns a theater and the ground whereon it stands, and that the same is done for profit; that it employs a manager to manage the same, and plays, operas and other attractions are performed therein.

*Ninth*—That it owns a large hall, known as "Market Hall," and the ground whereon it stands; that said hall is rented by it for divers purposes for which large halls of the kind are rented in cities, and a large income is derived therefrom.

*Tenth*—That it owns a large gas plant and operates the same in said town of Pullman, and rents said gas to the twelve thousand people residents of said town, to light their homes and for purposes of consumption, as well as to light said streets, and that from all these sources a large profit is derived.

*Eleventh*—That it owns and carries on a system of water mains and service pipes within the town of Pullman, and through these supplies, for profit, water to the different industries located in said town, as well as to the residence and apartment houses owned and rented by it; that it purchases said water from the city of Chicago and other sources, and sells the same, as aforesaid, for a large profit.

*Twelfth*—That it owns a plant for generating steam, and owns the pipes to convey the steam to the residences of its said tenants in the town of Pullman, and supplies said tenants in said town with such steam, together with merchants and others, for pecuniary profit, and derives a large income therefrom.

*Thirteenth*—That it owns and operates a large brick plant at Pullman; that it manufactures and sells brick, and places upon the market, wherever purchasers can be found, brick so manufactured; that it has been for many years a competitor in the market for the sale of brick.

*Fourteenth*—That it owns and operates a system of sewerage pipes and a pumping plant connected therewith; that through said sewerage pipes the sewerage and refuse accumulated in said town of twelve thousand inhabitants is pumped onto a large farm owned by it, and spread over the same; that said company cultivates said land so manured, and raises thereon large quantities of cabbage, celery, beets and other vegetables, and sells the same in the city of Chicago and other cities where it can find a market therefor, and makes shipments of such produce to the city of New Orleans, and that it realizes in this way large sums from operating said sewerage system and cultivating said farm.

*Fifteenth*—That it operates, in this State and elsewhere, through leases or contracts, a number of cars, and in these, day and night, carries and sells for profit stocks of whiskies, wines, beer and other malt and intoxicating liquors; that such whiskies, etc., are carried and sold for pecuniary gain, and in doing so it derives a large profit.

*Sixteenth*—That it owns near the Belt Line road twenty-five acres of ground which it does not use.

*Seventeenth*—That it owns near Lake Calumet one hundred and seventy-five acres of vacant and unoccupied land.

*Eighteenth*—That it owns fifty-five acres of land north of its shops, which land is vacant and unoccupied.

*Nineteenth*—That it owns sixteen acres of lots and blocks in the town of Pullman which are vacant and unoccupied.

*Twentieth*—That a certain corporation, known as the "Union Foundry and Pullman Car-Wheel Company," was organized and existed in Cook county, and owned about ten acres of ground purchased by it from appellee; that appellee owned its stock and had it organized, and now, in effect, controls and operates it; that in this way, and through this corporation, it manufactures structural iron and places the same upon the market.

*Twenty-first*—That it furnishes to the Allen Paper Car-Wheel Company the power that operates its machinery, and receives therefrom a large income.

*Twenty-second*—That it owns the stock of the Pullman Iron and Steel Company, and controls, directs and manipulates its affairs; that the said company manufactures bar iron, and for many years has manufactured railroad spikes, and sold the same upon the market wherever purchasers could be found therefor; that such sales and the manufacturing of such products are, in effect, made by defendant.

*Twenty-third*—That it organized, owned and controlled the Southern Pullman Palace Car Company; that it owned its stock, and that the said company is now merged in defendant.

*Twenty-fourth*—That it manipulates and controls the affairs of the town of Pullman, and maintains therein water and gas plants, and lights the streets of said town, and owns the same, and exercises privileges and powers incident to a municipal corporation.

*Twenty-fifth*—That it owns one hundred and ten acres of ground in Pullman, on which are erected its shops, and all that is not necessary for such purposes is a usurpation of power and contrary to law.

To the six pleas of the defendant, as originally filed, demurrers were sustained, upon the ground that each assumed to, but did not, answer the entire information. They were amended. Each of the amended pleas sets out the charter of defendant and then alleges certain matters as inducement, and concludes with a traverse under the *absque hoc*. The first amended plea assumes to answer the entire information, except so much thereof as charges the defendant with owning and holding certain shares of the capital stock in the Union Foundry and Pullman Car-Wheel Works, in the Southern Pullman Palace Car Company and in the Pullman Iron and Steel Company, and with selling and furnishing upon its sleeping cars,

whiskies, wines, beer and other malt and intoxicating liquors to persons traveling therein. The second and third pleas assume each the same burden as that assumed by the first, but with this additional exception: that neither of them purports to answer the charge of owning a large office building in the center of the city of Chicago. The fourth plea undertakes to answer only so much of the information as charges the defendant with owning and holding certain of the capital stock of the Pullman Iron and Steel Company. The fifth plea undertakes to answer only so much of the information as charges the defendant with selling and furnishing upon its sleeping cars, whiskies, wines, beer and other intoxicating liquors to persons traveling therein. And the sixth plea undertakes to answer the entire information, except that part of it which charges the defendant with owning and holding shares of the capital stock of the Pullman Iron and Steel Company.

Demurrers were interposed by the Attorney General to these several amended pleas. The demurrer to the fourth plea was sustained, and, the defendant electing to abide by its said plea, judgment was entered against it thereon, ousting the defendant from the liberty of owning capital stock in the Pullman Iron and Steel Company. The demurrers to the other pleas, however, were overruled, and, the Attorney General electing to abide by the demurrers, judgment was entered finding the defendant not guilty as charged against it in the information, except as to the charge of owning capital stock in said Pullman Iron and Steel Company. To the judgment of the court overruling the demurrer to the first, second, third, fifth and sixth pleas the People duly excepted and appealed from said judgment to this court. The defendant has assigned cross-errors on the ruling and judgment of the court sustaining the demurrer to the fourth plea.

Paragraph 23 of the amended sixth plea avers as follows: "Defendant further states that heretofore in this

plea it has set out all the business in which it is engaged
and all the real property which it owns in said county
of Cook, and particularly it here states that it does not
own any brick-yard and does not own one hundred and
seventy-five acres south of Lake Calumet; that it does
not own any stock in the Union Foundry and Pullman Car-
Wheel Works; that said Union Foundry and Pullman Car-
Wheel Company owns no property, and by action of its
stockholders it has ceased to exist; and that defendant
does not own any stock of the Southern Pullman Palace
Car Company, and exercises no control over it." The de-
murrer, of course, admits the truth of these several state-
ments and denials, and the effect of this disclaimer is to
eliminate from further consideration the charges of the
information in respect to said matters.

Each of the amended pleas, as already stated, sets
out the charter of the defendant and then alleges certain
matters of inducement, and concludes with a traverse un-
der the *absque hoc.* The design of a special traverse, as
distinguished from a common traverse, is to explain or
qualify the denial. The essential parts of such a plea
are the inducement, the denial and the verification. The
issuable part of the plea is the denial, which is under the
*absque hoc,* and when the denial under the *absque hoc* is
sufficient no issue of fact can be formed upon the induce-
ment. The matter, however, set up in the inducement
must be such as in itself amounts to a sufficient answer,
in substance, to the declaration or information. The
plaintiff may elect to either form an issue of fact by
pleading to the *absque hoc,* or to form an issue of law by
demurring to the plea, and thereby take exceptions, in
point of law, to the explanatory matters set up in the in-
ducement. In the several amended pleas in the case at
bar the denials under the *absque hoc* are amply and neces-
sarily sufficient, for, with the exception of the allegations
of the organization and existence of the defendant corpo-
ration, they specifically deny all the averments of the in-

formation. Therefore the questions to be determined upon this appeal have reference to the sufficiency of the matters stated in the inducements to said pleas to constitute valid answers and defenses, in substance, to the several charges made in the information. As matter of course, the demurrers admit the truth of all the statements made in the plea.

Counsel for appellee contend that full warrant and authority for the various acts which, as it appears from the pleas, the corporation has done, are to be found either in the powers expressly conferred by its charter or in the powers possessed by implication of law. In order to determine correctly the sufficiency of the pleas in the light of this contention of appellee, it is essential the rules and principles of law applicable to the matter of the express and implied powers of corporations should be ascertained and declared.

A corporation in our State has its existence by virtue of the enactment, general or special, of the law-making power. The appellee corporation was created by a special act of the General Assembly. The only difference between a corporation organized under a general law and one created by a special statute is, "that in the former we look to the certificate of the promoters, while in the latter we look to the special statute to ascertain the scope of the powers of the corporation." The rule for construing the instruments must necessarily be the same, viz., the powers specifically enumerated, and such other powers as are incidental or necessary to carry those powers into effect, but none others may be exercised by the corporation. *Rockhold* v. *Canton Masonic Benevolent Society*, 129 Ill. 440.

The enactment creating the appellee corporation is the full measure of its power. In order to enable it to carry into execution the powers thus conferred it may exercise other powers, known to the law as incidental or implied powers. Implied powers exist only to enable a corporation to carry out the express powers granted,—

that is, to accomplish the purpose of its existence,—and can in no case avail to enlarge the express powers, and thereby warrant it to devote its efforts and capital to other purposes than such as its charter expressly authorizes, or to engage in collateral enterprises not directly but only remotely connected with its specific corporate purposes. A power which the law will regard as existing by implication must be one in a sense necessary,—that is, needful, suitable and proper to accomplish the object of the grant, and one that is directly and immediately appropriate to the execution of the specific powers, and not one that has but a slight, indirect or remote relation to the specific purposes of the corporation. *Illinois Conference Female College* v. *Cooper*, 25 Ill. 133; *Caldwell* v. *City of Alton*, 33 id. 416; *Chicago, Pekin and Southwestern Railroad Co.* v. *Town of Marseilles*, 84 id. 643; *Chicago Gas Light Co.* v. *People's Gas Light Co.* 121 id. 530; *Mott* v. *Danville Seminary*, 129 id. 403; *People* v. *Chicago Gas Trust Co.* 130 id. 268; *North Side Railroad Co.* v. *Worthington*, (Tex.) 30 S. W. Rep. 1055; Field on Corporations, secs. 53, 54; 4 Thompson's Law of Corp. sec. 5638; 2 Beach on Private Corp. sec. 385; Green's Brice's Ultra Vires, 88, 89.

Keeping these definitions as to implied powers in view, we may proceed to determine whether the acts set forth in the pleas are within or beyond the measure of power possessed by the appellee company.

The information charges that the defendant owns and controls within the city of Chicago a large ten-story business block, together with the ground on which said building stands, worth $2,000,000; that the defendant occupies a portion, only, of said building for purposes of its own corporation business, and that it leases about three-fourths of the building to other persons, firms or corporations, and receives a large consideration from the occupants thereof as rentals; that said block was built by the defendant as an investment, and charges that the said building was erected without warrant or authority

of law. The defendant sets up by way of inducement in its plea, that it has had, ever since its organization, its general offices near the business center of the city of Chicago, and that it is necessary and proper to do so; that it became impossible to rent proper general offices, and that the rentals charged for poor offices were high and exorbitant; that thereupon, in 1880, it purchased a lot of land, 75 by 170 feet, at the corner of Michigan avenue and Adams street, and erected thereon a building, in which it ever since has kept its general offices and some store rooms; that the said land was valuable, and could not, without great loss, be utilized for erecting a building other than a high building, and such as is in keeping with and equal to the surrounding buildings; that thereupon defendant erected thereon a nine-story building, of which it now uses nearly one-half, and that if its business continues to increase as it has in the past, it will soon also use it all for its general offices; that in the meantime it rents to different parties such offices as it is not at present using; that erecting such buildings is in keeping with the usual practice of other large corporations doing kindred business, and that it could not now rent such general offices as it requires, in the business center of Chicago, for a rental as low as five per centum per annum on the amount which said building and the land on which it stands cost defendant.

The defendant is authorized by section 6 of its charter to purchase, acquire and hold such real estate as may be necessary for the successful prosecution of its business; but it is contended that the building in question is much larger and contains many more rooms and offices than the business or wants of the corporation demand; that only a small portion of it is occupied by the company's employees; that it was erected as an investment by the company, and therefore that the company owns and maintains the building without authority of law. We are concerned, however, with the averments of the plea the

truth of which are admitted by the demurrer.    The plea avers it was necessary and proper the general offices of the appellee should be maintained near the business center of the city of Chicago, and that such offices have always been maintained in that locality; that it became impossible to rent suitable general offices there, and even insufficient and undesirable offices could only be obtained at high and exorbitant rentals; that the business of the company was large and rapidly increasing, and that good business judgment dictated the company should provide its own offices, and that in view of the fact that desirable ground was very valuable, and that more office room would be needed in the future to accommodate the growing business of the company, it was determined to construct a larger building than was at the time actually needed and necessary and to rent such offices as were not at the present needed, and that, moved by such consideration, the building was erected; that if the business of the corporation continues to increase as it has in the past, the entire building will soon be devoted to the uses of the company.

We think the plea presented a good defense to the charges preferred in the information with reference to this building.    The right of the appellee to construct an office building is indisputable, as so, also, is the right to select the most eligible and desirable site. It would be but a narrow and wholly unjustifiable view of this power to insist that in planning and constructing the building the corporation should leave out of consideration its probable prospective requirements, and should erect a building containing only as many rooms and offices as its present business might demand.    The corporation had the right, as we think, to look to and prepare for the future. It was but true economy to do so, and if it proceeded in good faith, as we are to assume from the conceded averments of the plea it did, no reason is perceived why it should be deemed bound by law to permit such parts of the building

as are not for the present required for the accommodation of its business, to remain vacant, but, on the contrary, that it might lawfully obtain such income from the rents of such rooms as might be possible until the growth or increase of its business demanded the additional rooms or offices. A corporation could not be permitted, under mere color and pretense of furnishing accommodations for the transaction of its own affairs, to construct houses or rooms for the purpose of renting the same, and engage in renting such houses or rooms as a business, if such pursuit was, as it here clearly is, beyond and distinct from that it was created to pursue and accomplish. But the averments of the plea do not justify the imputation that the acts of the company under consideration are but colorable, and in this investigation the averments stand confessed by the State.

It appears from the averments of those pleas which are intended to answer the allegations of the information set forth hereinbefore as Nos. 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 13 and 24, that the defendant company, about the year 1880, acquired and now holds a certain tract of land containing about eighty-three acres, on a portion of which, in the year 1880,—at least not later than 1882,—it caused to be constructed a large number of dwellings and tenement houses, some of the height of two stories and others three stories in height; that the total number of such buildings is twenty-two hundred, and that it has laid out and now maintains the usual and necessary streets and alleys to afford the tenants to whom it rents said dwellings and tenement houses the proper and usual means of ingress and egress to and from their homes and places of business; that it now rents said dwellings and tenements to its employees; that upon the same plat of ground upon which said dwellings and tenements stand and where said streets and alleys are located it caused to be erected a number of school houses, a church edifice, a hotel, a large building called "The Arcade," in which are a number of rooms, some of which were constructed to be rented for dry

goods, grocery and other retail stores, and other of the rooms were built for school, lecture and theater rooms and for the use of religious congregations for church purposes, and that it now rents the rooms in said "Arcade" for the various purposes for which they were intended when built; that it has also constructed on the same plat of ground a large building called "Market Hall," the lower floor whereof it caused to be fitted up for meat and vegetable markets, and it has rented and now rents them to retail dealers in such articles of food, and the upper floor is a large hall where concerts, dances and other entertainments may be given and is rented by it for such purposes; that it maintains a system of water-works and sewers, and a gas plant, and for a consideration supplies those who inhabit its houses with water, light and heat.

From these averments but one conclusion is admissible, which is, the appellee corporation became and is now the proprietor of the lots, streets, alleys, sewer system, dwellings, tenement houses, churches, hotel, schools, theater and business buildings composing a town or city of more than two thousand houses, no one of which is occupied by any other than a tenant of the corporation. The powers vested in the corporation by the words of its charter are, "to manufacture, construct and purchase railway cars, with all convenient appendages and supplies for persons traveling therein, and the same may sell or use, or permit to be used, in such manner and upon such terms as the said company may think fit and proper." Manifestly the acts of the corporation which have resulted in the creation of this town or city and its acts in connection with the streets, alleys, dwellings, tenements, school, church and business houses, water system, sewerage, heat, etc., which the plea admits it was performing at the time of the filing of the information, cannot be regarded as the exercise of powers expressly given. Can they be justified as the proper exercise of powers incidental to the express powers possessed by the corporation, or by

the provision in the sixth clause of the charter that it may be lawful, for the corporation to acquire and hold such real estate as may be deemed necessary for the successful prosecution of its business? The declaration of the sixth clause is not that the company may acquire and hold such real estate as it or its directory may deem necessary, but such as may be deemed necessary to the successful prosecution of its business. The true meaning of this clause is not that the company or its governing body is vested with unlimited and unbridled power to acquire and hold such real estate as it may deem necessary, but with power to purchase and hold only such real estate as, under the rules of law, may be deemed necessary for the successful prosecution of its business. "The rule of construction, when any doubt arises out of any language employed in such a charter, is, that every power that is not clearly granted is withheld, and that any ambiguity in the terms of the grant must operate against the corporation and in favor of the public." (*American Trust Co.* v. *Minnesota and Northwestern Railroad Co.* 157 Ill. 641; *Illinois Health University* v. *People*, 166 id. 171.) "Irrespective of the operation of statutory restrictions, it is a settled principle of American jurisprudence that a corporation cannot take and hold land except in so far as reasonably necessary to carry out the objects of its creation. These bodies, which never die, are not allowed, against the objection of the State, to take and hold land for purposes wholly foreign to the purposes for which the State endowed them with corporate existence and the power of perpetual succession." 5 Thompson's Law of Corp. sec. 5772.

This court has declared that it is against the public policy of this State to allow corporations to own real estate beyond what is necessary for the transaction of their corporate business or such as is acquired in the collection of debts. (*Carroll* v. *City of East St. Louis*, 67 Ill. 568; *United States Trust Co.* v. *Lee*, 73 id. 142.) And in furtherance of this declared public policy statutes have been

enacted by the General Assembly requiring all corporations which have acquired lands in the collection of debts to sell and dispose of all that is not necessary to the purposes of the corporation and providing remedies designed to coerce compliance with such requirements. Rev. Stat. sec. 517, chap. 32, entitled "Corporations."

It seems perfectly clear the charter of the corporation did not clothe it with express power to purchase the real estate upon which the town or city of Pullman is built, or to construct the buildings in said town or city, or to engage in the business of renting dwellings, store rooms, market places, etc. Nor is express power to authorize such acts relied upon, but the contention is they were fully warranted by the powers derived from the implications of the law. What powers are to be implied by law must, as a matter of course, depend largely upon the surrounding circumstances. With a view of showing that the situation at the time justified the course pursued by the company and was sufficient to invest it with the legal right to pursue such course, the appellee company filed pleas averring, in substance, as follows: That after it had been for several years in the exercise of the powers conferred by its charter, its business increased to such an extent that it became necessary for it to build large and extensive shops in which to manufacture cars; that a large amount of land was necessary on which to locate such shops; that it was decided to locate and build said shops in the county of Cook, in or near the city of Chicago, where its general offices and headquarters were and where its principal officers resided; that it found that it could not acquire a sufficient amount of land upon which to erect said shops within the city of Chicago on account of the high price of land in said city; that after diligent and careful inquiry as to the price of land and the means of access thereto it decided to build its shops where they are now situated, being upon a parcel of land lying between the west bank of Lake Calumet and the Illinois

Central railroad; that it, about the year 1880, purchased a tract of about three hundred and forty-three acres, then of comparatively small value, being unimproved, low-lying land, held as acre or pasturage land, not included in any municipality and not subdivided; that at the time of said purchase and at the time of the planning and laying out of the manufacturing plant of defendant there were not more than twenty-five dwelling houses within a radius of two miles of said land, all of which were fully occupied; that it was impossible to get good, skilled work-men to come and work at said manufacturing plant unless they could obtain homes in the immediate vicinity; that to get workmen and other employees, skilled and other-wise, at its said manufacturing plant, the defendant was obliged to build and erect a sufficient number of houses or tenements to accommodate as many as possible of its employees, and that in order to attract to said manufac-tory the best class of skill and labor, it, in or about the year 1880, and not later than 1882, erected upon a part of said lands twenty-two hundred houses and tenements, and that the same were so built for the purpose of induc-ing the best class of workmen to become employed at the defendant's manufactory; that the same were only built for the purpose of so accommodating the defendant's em-ployees, were not built for any profit or income there-from, but that the defendant might be able to obtain good, skilled labor in its manufactory; that they are not a prof-itable investment, and were and are only built and held by the defendant because the same are "necessary for the successful prosecution of its business."

Defendant alleges also in its pleas, as inducement, that in order to obtain a better class of skilled employees, especially those with families, to work in its manufactory, it was absolutely necessary that there should be provided near their homes proper educational facilities; that to meet the said demand and to accommodate the desire of said employees that their children should receive ordinary

education, defendant erected several school houses near
the said dwellings, and schools were and are held therein
and the children of such employees receive instruction
therein; that said buildings are all now within the limits
of the city of Chicago and said school houses are rented
to the board of education of said city, which has the sole
control and charge of the said buildings; that it became
and was necessary that certain places for divine worship
should be provided near the said dwellings of defendants'
employees, and to meet that demand a church was erected
and furnished to a congregation using it, at a purely
nominal rental; that on this tract of land, and near said
dwelling houses, defendant erected a building called the
"Arcade Building;" that on the first floor thereof are
rooms rented by defendant to storekeepers, because when
the town of Pullman was built there were no stores within
a reasonable distance at which the company's employees
could buy the ordinary necessities of life; that from said
stores were and are sold to said employees groceries,
clothing and all other things usually purchased by them;
that defendant has not, and never has had, any interest
in the said stores or the profits derived therefrom; that
it does not allow its employees to give orders upon it to
the said stores; that the said stores are rented at a very
low rate, and that said building was not built for profit
but only for the convenience of said employees; that on
the second and third floors thereof is a public library for
the use of said employees and their families, for which
no rent is charged, and two large halls used for religious
worship for the use of said employees and their families,
and which are furnished by defendant to congregations
of its employees at a nominal rental; that in said build-
ing are also two or three rooms rented by the board of
education of the city of Chicago for school purposes, and
in which the children of said employees are taught; that
in said building there is also a room erected as a lecture
room and theater, provided only to give said employees

and their families recreation; that no theatrical entertainments are given in said building by defendant, but the same is furnished for use to said employees or associations of them, and it is largely used by them for entertainments given by themselves and for a place in which they may practice music; that on said land near its manufacturing plant defendant erected a small building which was used as a hotel, for the purpose of furnishing accommodations to intending purchasers of defendant's cars, their agents and inspectors; that said hotel was and is a necessary part of defendant's manufacturing plant; that the defendant built on said grounds a building known as "Market Hall," the upper story of which is a large hall furnished to employees in which they hold entertainments, such as concerts and dancing, and on the lower floor are stores, which are rented out to persons who use the same as meat markets; that in order to properly operate its manufacturing plant it became and was necessary to erect a gas plant, from which it furnishes light through all its manufacturing buildings, and has, upon their request, furnished gas at a fair and reasonable price to certain of its employees occupying some of its houses, but that the gas so furnished said employees does not amount to ten per cent of the gas produced by said gas plant and used in defendant's shops; that at the time of the erection of said manufacturing plant there were no water-works at or near said lands, and defendant erected a water tower and plant upon its premises principally for supplying water throughout its shops, and contracted with the village of Hyde Park for the furnishing to the defendant of large amounts of water through the water mains of the said village; that most of the water passing through said water mains and through said water tower is used in the shops of defendant, but a small percentage thereof is furnished to said employees in their homes; that said water is furnished to said employees at a very low rate and at less than the cost thereof to defendant,

and because said employees cannot in any other way procure a supply of water; that when said manufacturing plant was built defendant put in a very large system of boilers for generating steam; that said boilers and steam capacity probably will all be required for use in operating said shops, but up to this time there has been a surplus of steam generated, and at the request of said employees steam-pipes have, in a few instances, been run into their said houses and dwellings, and through said steam-pipes some of said houses and dwellings have been heated; that in like manner it has furnished for a money consideration part of its present surplus steam and engine power to the Allen Paper Car-Wheel Company, whose shops adjoin the property of defendant; that in connection with said manufacturing plant and dwelling houses defendant set apart eighteen acres of land as recreation grounds for the use of its said employees, which includes a place for playing base-ball, foot-ball, and many other kinds of athletic exercises, and for the use of said recreation grounds it charges no rental or admission fee; that said grounds are furnished with divers appliances for athletic exercises, and are free to all of said employees and their families and are used as pleasure grounds by them; that also in connection with said manufacturing plant and dwelling houses it set apart about thirteen acres for pleasure grounds for its said employees and their families, the said pleasure grounds including what is usually called a park, together with a greenhouse and other such accessories, and defendant has established and maintained the same only for the purpose of attracting to its works the best class of skilled workmen.

In the light of the well settled rule a plea is to be construed most strongly against the pleader, the averments of appellee's pleas are to be interpreted to disclose that the measures which the appellee corporation adopted looking toward the re-location and removal of its plant included, as a fully matured part thereof, the plan of

building the resident, tenement and business houses and constructing the streets and alleys,—in fact, providing a town or city wherein its employees might or should dwell and of which it should be the sole owner and proprietor, and that in pursuance of this plan a tract of land was acquired sufficiently large to receive and accommodate, not only the manufacturing plant of the corporation, but also to provide the necessary space for the streets, alleys, dwellings, tenements, hotel, church, opera house and other business houses which the scheme of the corporation included; and it is to be further necessarily inferred, on a proper construction of the plea, that the work of erecting the buildings comprising the manufacturing plant proper and the buildings which compose the town or city, was entered upon and carried along at the same time and together. Nor is this interpretation of the pleas at all harsh or doubtful, but is the same as that entertained by counsel for appellee who drafted the pleas. Speaking upon the point, counsel for appellee, on pages 51 and 52 of their brief filed in this court, say:

"Accordingly, in the exercise of its best judgment, appellee selected and purchased about three hundred and fifty acres of land situated upon the shores of Lake Calumet, fourteen miles distant from its offices and ten miles beyond the then limits of the city of Chicago. The land at that time was practically an unoccupied waste. It was surrounded for a very considerable distance, in all directions save toward the lake, by farming and unoccupied lands. There were no convenient places where employees of the company could find homes or dwelling places. The construction of the manufactory therefore involved, not the expediency, simply, but the necessity, of providing places suitable for the occupancy of those who were to do its work. The manufactory and the homes for the workmen were mutually and equally necessary to the success of the enterprise. 'The power to manufacture cars' was barren without the other charter power 'to purchase,

acquire and hold such real estate as may be deemed necessary.' It was only by the combination of the two,— by their exercise together, in the manner which has been described,—that the object of the charter, 'the successful prosecution of their business,' could be accomplished. Accordingly, the exercise of these powers was undertaken cotemporaneously. The construction of the works and the construction of the dwelling places of those who were to operate them was undertaken at the same time and as a part of a single, harmonious scheme. Two years of time, and the labor of four thousand men transported daily to and fro between Chicago and the point of location, were devoted to the work. At the expiration of that time the result appeared in the completed structures of a manufactory giving employment to five thousand persons, and in its immediate vicinity dwelling houses sufficient in number for the comfortable occupancy of a large part of these persons with their families and those dependent upon them, with the necessary school houses for the education of their children, churches for their religious instruction, stores and shops where the necessaries of life could be procured, halls suitable for lectures and social entertainments,—all so arranged, with such accessories of streets, parks and other provisions, as to minister not simply to the necessities, but also to the comfort and well-being of those who might be employed."

It further appears from the plea the corporation at once, after the buildings composing the town of Pullman and its streets and alleys were completed, rented the dwellings, tenements, business rooms, church, theater room, school rooms, etc., and for a compensation undertook to supply the inhabitants of the town with water, light and heat, and that it has since continued to perform such acts, and was pursuing the same course when the information was filed. The location selected by the corporation for the new site of its plant was within a few miles of the populous and wealthy city of Chicago, upon

a line of railway which furnished adequate and speedy means of transportation to and from the city, so that the plant and its surroundings in fact were within the suburbs of the city. There were then, it is true, only a few buildings in the vicinity of the proposed new location. The establishment of the works of the appellee corporation would make it imperative that other buildings, dwellings and tenement houses should be constructed for the accommodation of those who should find employment in appellee's shops.

The averment of the plea the corporation was obliged to construct such houses and tenements is but the statement of a conclusion, and we find the facts pleaded do not justify such a deduction. No reason existed, nor do we find in the pleas even a suggestion that there was reason or ground, for the apprehension that individual enterprise and private capital would not at once, after the purpose and intention of the corporation became known, provide all necessary dwellings and tenements for the accommodation of the workmen, or that the wants of the community composed of such workmen would not at once be met by the location in its midst of schools, churches, dry goods and grocery stores, meat markets, etc., or that the necessary streets, alleys and public ways would not be provided without any intervention whatever on the part of the corporation. The public laws of the State would have supplied the requisite school houses and teachers, and the inclinations of the individual members of the community could have been safely relied upon to provide church houses and rooms for imparting religious instruction. It is idle to argue it became in any sense necessary or directly appropriate to the accomplishment of the lawful and chartered purposes or objects of the corporation it should engage its efforts or capital in the construction of dwellings, tenement houses, store houses, streets, alleys, theaters, hotel, churches, school houses, water-works, a system of sewers, etc. Workmen, if they

have families, must have homes, or if unmarried must be accommodated with boarding and places of lodging. Homes, groceries, vegetables, bread, meat, clothing, furniture, light, heat, water, school books, medicine, the services of physicians, dentists and other professional men, and many other things, become necessary to the health, comfort or convenience of such workmen and their families; but the right and power to supply such wants had, in this instance, so far as the pleas show, no direct relation or connection with the successful prosecution of the specific object of the appellee corporation. The relation was but remote, indirect and mediate,—not direct and immediate. Implied power cannot be invoked to authorize a corporation to engage in collateral enterprises but remotely connected with the specific purposes it was created to accomplish. A power which a corporation may exercise by implication must be bounded by the purposes of the corporate existence and the terms and intention of the charter, and acts which tend only remotely and by indirection to promote its interest and chartered objects can not be justified by implication of law, but are *ultra vires*.

Cases cited holding corporations operating mines or mills engaged in sawing lumber had implied power to construct dwellings and boarding houses for their employees can have little or no influence upon the question here presented. In those cases the fact the works or mills of the corporations were necessarily located at mines or near large forests, and other circumstances peculiar to the respective cases, were deemed sufficient to justify the corporations in arranging for the lodging or boarding of their workmen or in building homes to shelter them and their families. The circumstances in each of such cases as can be accepted as having been well considered, were such it became, in a legal sense, necessary to the accomplishment of the chartered purposes of the corporation that it should exercise such power as was accorded it by implication of law. Exceptional circumstances or extra-

ordinary conditions may make it necessary to the proper prosecution of the business of a corporation that it shall be accorded implied power to perform acts beyond its express power, and which, except for the prevailing conditions, would be wholly unwarranted. But in the case in hand the appellee corporation voluntarily assumed to devote its corporate capital and power to that which, to say the least, but remotely and indirectly tended to aid the accomplishment of the purposes it had the right to pursue under conditions and circumstances which were neither rare nor unusual.

The argument of counsel for appellee that the construction of the manufacturing plant involved, not the expediency, simply, but the necessity, of providing places suitable for the occupancy of those who were to do its work, "and that in view of this the company determined to undertake, and did undertake, to construct its works and dwelling places for its workmen at the same time and as a part of a single harmonious plan," is fallacious. It ignores the palpable fact that no duty of providing houses for its workmen was pressed upon the company by surrounding conditions or circumstances as a necessity, but was adopted as a matter of choice, based, it may have been, upon motives which were, in part, benevolent or charitable in their nature. Had it purchased only that quantity of ground needful for its proper corporate uses, and restricted its efforts and expenditures to the construction of such buildings as would have answered its corporate wants, there appears to us no reason to believe that the question of homes for its workmen, market places or stores where such workmen could purchase supplies, or school rooms where their children could receive instruction, or the making of streets and alleys, would ever have demanded the thought or attention of its governing body. It is beyond reason to conclude that, had the way been left open, private capital and individual enterprise would have overlooked this de-

sirable field of operations, or that merchants, tradesmen, butchers and other classes of business men would not have appeared and entered into business rivalry for the custom of the workmen and their families, and that the prosecution of the business of the corporation would have suffered because its workmen could not find homes or places where the articles necessary to supply their wants and add to their comfort could be purchased,—and yet it is upon this ground it is sought to justify the acts of the corporation which are now under consideration.

The prohibition of the law against the unauthorized exercise of power by corporations is based upon grounds of public policy, and the wisdom of the rule may here find exemplification. Conceding the rectitude of the purpose which it is alleged operated to induce the acts of the corporation which resulted in the creation of the town or city of Pullman, we are constrained to declare the corporation had not lawful power to perform such acts, and that the existence of a town or city where the streets, alleys, school houses, business houses, sewerage system, hotels, churches, theaters, water-works, market places, dwellings and tenements are the exclusive property of a corporation is opposed to good public policy and incompatible with the theory and spirit of our institutions. It is clearly the theory of our law, streets, alleys and public ways, and public school buildings, should be committed to the control of the proper public authorities, and that real estate should be kept as fully as possible in the channels of trade and commerce, and good public policy demands that the number of persons who should engage in the business of selling such articles as are necessary to the support, maintenance and comfort of the people of any community should not be restricted by the will of any person, natural or artificial, but should be left to be determined by the healthy, wholesome and natural operations of the rules of trade and business, free from all that which tends to stifle competition and foster monopolies.

We think the averments of the plea in response to the allegations of the information under consideration were insufficient to present a legal defense. ·

The information charges, as is shown by the fourteenth allegation set out in the opening of this opinion, the appellee corporation has constructed, owns and is operating a sewerage system and a sewerage farm; that it has constructed sewerage pipes so as to receive and convey to the farm the sewerage and refuse matter accumulated in and about the residences, tenement houses and other buildings which it rents in the said city or town of Pullman, and uses said sewerage for the purpose of fertilizing the farm; that the farm consists of one hundred and fifty-four acres, and is cultivated by the appellee corporation, and large quantities of celery, beets and other vegetables produced thereon are by the said corporation sold in the city of Chicago or shipped to other cities for sale. With respect to this sewerage system and the business of gardening or truck farming upon the sewerage farm, the effect of the allegations of the plea are, that having constructed the great number of dwellings, tenement houses and other buildings, and rented the same to its employees, it became necessary the corporation should adopt some mode or manner of disposing of the sewerage in order to render and keep the said dwellings and buildings in a healthful condition; that it purchased the one hundred and fifty-four acres of land in order to enable it to utilize the sewerage and refuse matter as a fertilizer, whereby to render the land productive, and that the income from the farm recompenses the corporation in part, and only in part, for the expenses of the sewerage system. But if we are right in the view hereinbefore expressed, that the action of the corporation in constructing the buildings and dwellings of which the town or city of Pullman is composed was beyond its proper corporate functions, it would necessarily follow the operation of the sewerage system and the prosecution of the business of farming or truck gar-

dening cannot be justified upon the ground it was necessary the dwellings and houses of those persons living in the city or town of Pullman should be supplied with such sewerage system. One usurpation of power cannot be seized upon.as a justification for the exercise of a further unlawful power.

The information charges that the defendant, in a large number of its cars, carries a stock of whiskies, wines, beers, and other malt and intoxicating liquors, for the purpose of sale to its guests and the occupants of the cars while traveling therein, and sells and disposes of the same at a large pecuniary profit. The defendant, by its plea, admits that it does provide, for people traveling in its cars, supplies of divers kinds of food and drink, including whiskies, wines, beers and other malt and intoxicating liquors, but avers that it sells the same, under proper licenses from State and general governments, for the purpose of meeting the necessities and demands of its patrons and contributing to their comfort, and that it makes no profit whatever therefrom, but furnishes said supplies at a pecuniary loss to itself, and claims a right to sell them by virtue of section 4 of its charter, which provides that "the said corporation shall have power to manufacture, construct and purchase railway cars, with all convenient appendages and supplies for persons traveling therein, and the same may sell or use, or permit to be used, in such manner and upon such terms as the said company may think fit and proper." Express power to sell supplies to persons traveling on its cars must be conceded to the corporation. Are wines and liquors a part of the "supplies" for travelers? No authorities on this subject are cited in the briefs of counsel. Webster defines the word "supply" (plural, "supplies,") as "that which supplies a want; sufficiency of things for use or want; especially, the food, and the like, which meets the daily necessities of an army or other large body of men." It would seem that this definition answers the question in the affirma-

tive. Wines and liquors are a part of the supplies which meet the wants of a portion, at least, of the traveling public. They enter into and compose, in part, the daily meals of many travelers, and are regarded by all such persons, and by others who use them at other times, as wholesome refreshments, contributing to relieve from the fatigue and discomforts of travel. Hence they are supplies for such persons. It is a matter of common knowledge that places for the accommodation and entertainment of travelers, such as hotels and taverns, and steamboats and ocean vessels, which carry passengers, almost universally sell to their guests and patrons whiskies, wines and liquors, and that such things are regarded by a portion of the traveling public, and by those who transport and entertain them, as part of the "supplies" for travelers. We think that the defendant having, as the plea averred, had license to sell intoxicating liquors, was authorized by its charter to furnish such supplies to persons traveling in its cars, and that the charge in the information is sufficiently answered by the plea.

The information charges that the defendant owns fifty-five acres of vacant and unoccupied land north of its shops, and that it also owns other vacant and unoccupied land at Pullman to the extent of sixteen acres. The defendant's plea avers, as to said fifty-five acres, that they are now in actual, constant and necessary use by it for dumping thereon cinders and other refuse from its shops, and will, in the near future, be necessary for further extensions of defendant's manufacturing plant. It clearly appears, the allegations of the plea being taken as true, that this tract of land of fifty-five acres is devoted to legitimate corporate purposes. Whether so actually, constantly and necessarily used is a question to be determined on the trial of the issue.

As to the other vacant and unoccupied land, the plea admits that the defendant owns twenty-three acres of such land, but avers that said twenty-three acres are the

unoccupied part of a tract of sixty-three acres whereon
are located its dwellings and tenements, churches, busi-
ness houses, etc., which are scattered over the whole of
the said tract, and in such a way that no particular part
of any appreciable size is unoccupied, and that the said
twenty-three acres consist of the spaces between said
houses; that the land was purchased, and has been and is
held, solely to meet the necessity for additional houses
and tenements as the growth of the company's business
may require, and in order that the health and comfort
of its employees might be conserved by the avoidance of
tenements and houses too closely crowded together. Hav-
ing hereinbefore determined that the erection by the ap-
pellee corporation of the dwellings and buildings in the
city or town of Pullman was beyond its corporate powers,
the conclusion is inevitable that the corporation has no
lawful right to hold and own this twenty-three acre tract
"solely to meet the necessity for additional houses and
tenements as the growth of its business may require."
The demurrer to the allegations of the plea with respect
of this tract of land should have been sustained.

We think it clearly appears from the allegations of
the plea the corporation acquired and owns the twenty-
five acres of land near the Belt Line railroad for the
proper purposes of its existence. It is stated in the plea
that many of the cars made by the defendant, and others
sent to it to be repaired, are delivered upon the Belt
Line railroad running north of its manufacturing plant;
that to receive and properly store said cars while wait-
ing their turn to be repaired, and to properly store them
after being built and repaired and while awaiting inspec-
tion by railroad companies, it was and is necessary that
the defendant should have storage yards or tracks near
said railroad at Grand Crossing, about three miles from
defendant's manufacturing plant, and it accordingly pur-
chased about and not to exceed twenty acres of ground,
near said railroad, and now holds the same for the pur-

pose above mentioned; that it has not, as yet, put any railroad or storage tracks upon said land, because the railroad companies owning tracks in the immediate vicinity have built so many side and storage tracks which can be used for storage purposes, but that it will be necessary, in the near future, for defendant to put tracks upon said twenty acres for storing and switching purposes, as aforesaid, and that it holds said land for such use in its manufacturing business. These averments are admitted by the demurrer, and constitute a complete answer to the charge in the information.

The allegation that the appellee company furnishes the Allen Paper Car-Wheel Company with steam power to operate the machinery of the latter company, and receives a large income therefrom, is fully met by the averments of the plea. The plea avers that when the manufacturing plant of the appellee corporation was built, with a view of anticipating its probable future wants the company put in a very large system of boilers for generating steam; that the steam power which said boilers are capable of producing will, in the judgment of the corporation, be no more than will be required in the future for the successful operation of the machinery and appliances of the plant of the appellee company, but that up to this time more steam has been generated than the company's uses required, and that the surplus has been furnished to the said Allen Paper Car-Wheel Company, whose shops adjoin the plant of the appellee corporation. It is entirely competent and proper for a corporation to keep in view its probable future wants and necessities, and in constructing its buildings and purchasing machinery to anticipate and provide for that which sound practical judgment and wise forethought indicate will be required by the growth of its business and the extension of the volume of its operations. It being lawful to purchase boilers having a capacity to generate more steam than the immediate needs of the company required, the

law has no rule which would require that the excess of steam so provided should not be utilized but should be allowed to go to waste. It was but true economy, and in no sense a usurpation of power, to dispose of the excess of steam so produced to the Allen Paper Car-Wheel Company.

The pleas admit the appellee company has purchased and holds a majority of the shares of the capital stock of the Pullman Iron and Steel Company, and avers further that said Pullman Iron and Steel Company was never a competitor in business with defendant; that its products constitute a necessary part of the material required in the construction of the cars manufactured by defendant; that all its product is used and consumed by said defendant, and that the said corporation is, in effect, a mere department of defendant in its car manufacturing business, although existing nominally as an independent corporation. The right and power of a corporation to become a stockholder in another corporation was presented to this court for determination in the case of *People* v. *Chicago Gas Trust Co.* 130 Ill. 268, and the conclusion arrived at was, that a corporation cannot become a stockholder in another corporation unless power to do so is specifically granted in its charter or necessarily implied from it. The conclusion there announced is the prevailing doctrine in America, and we see no reason to depart from it. Such power is not specifically granted to the appellee corporation, and there is no room for the contention that it is possessed as an implied power. The decision of the circuit court ousting the appellee from the right to hold capital stock in the Pullman Iron and Steel Company was correct, and is affirmed.

The defense of acquiescence and waiver has been set up in the case in the sixth plea. That part of the plea is as follows: "Defendant further avers that said manufacturing plant, houses, and all other improvements in the town of Pullman, and all the real estate in this plea

described, were acquired by defendant and said buildings were erected in and about the year A. D. 1880, and not later than the year A. D. 1882, and defendant has been in continuous use thereof, in manner above described, ever since; and defendant avers that all of its said acts have been well known to plaintiff ever since said last mentioned date, and the doings of defendant in regard thereto were a special subject of investigation, report and approval by the legislature of the State of Illinois since said last mentioned date, and that defendant has, during all of said time, been taxed by the municipal and State taxing authorities of Illinois, and in, to-wit, A. D. 1891, the legislature of Illinois appointed a committee thereof to investigate the property of defendant and ascertain if it .was properly taxed on all its property; that said committee examined all defendant's property, including all the property mentioned in this plea, and reported to said legislature concerning said holdings of property by defendant, and that its property was all properly taxed, which report was accepted and approved by said legislature, whereby any fault that the defendant may have committed in regard thereto has been acquiesced in or waived by the plaintiff."

It is conceded the State, acting in its character as a sovereign, is not bound by any statute of limitations or technical estoppel. It is urged, however, that in *quo warranto,* under the common law rule, the courts, in the exercise of their discretion to grant the writ or not, or upon final hearing, refused aid when the conditions complained of had existed for a number of years with knowledge on the part of the sovereign, and that the provisions of section 1 of chapter 112 of the Revised Statutes, entitled "Quo Warranto," that leave to file the information shall be given if the court or judge to whom the petition is presented shall be satisfied there is probable cause for the proceeding, leave the court still possessed of power to consider upon the hearing and then apply the same doc-

trine of waiver and acquiescence. It is the general rule that *laches*, acquiescence, or unreasonable delay in the performance of duty on the part of the officers of the State, is not imputable to the State when acting in its character as a sovereign. There are exceptions to this general rule, but we are unable to see that the allegations of the plea bring the case within the principles of any such exceptions.

The case of *Trustees* v. *School Directors*, 88 Ill. 100, was a writ of *certiorari* to test the validity of the act of detaching territory from one school district and attaching it to another, and the case of *People* v. *Boyd*, 132 Ill. 60, to test the legality of the formation of a school district by the consolidation of two other districts. These cases are relied upon by appellee. In each of them the doctrine of acquiescence or *laches* was applied upon the ground, to quote from the opinion in the former of the cases, "because these bodies (the school directors) exercise powers in which the people at large are concerned, and great detriment or inconvenience might result from interfering with their proceedings;" and the reason which operated to control the decision in the latter case is, that public policy forbade that such writ should be granted to test the validity of the organization of corporations exercising governmental power, after such corporations had been acting *de facto* for a considerable length of time. The ground of decision is the same in each case, namely, that public policy forbids the interference upon the part of the State with corporations created for the purpose of exercising governmental functions, unless application is made to the courts before the public interests become involved. The cases have no application here.

The cases of *The King* v. *Dawes*, and *The King* v. *Martin*, 1 W. Black. 634, also cited in behalf of the appellee, involved the title to the offices of burgesses of the borough of Winchelsea, and the relators were private informers. The writs were refused upon the ground the informers

were private individuals and knew the alleged disqualifications of the defendants, and had long acquiesced in their official incumbency of the offices, and also upon the same grounds which found operation in the Illinois cases, that the public consequences "to the borough" forbade the issuing of the writs upon grounds of public policy. Where the design of the writ of *quo warranto* is to procure a declaration of forfeiture of the charter of a corporation upon the ground it has failed to perform some act the performance of which constituted a condition precedent to its legal organization, or upon the ground the organization of the corporation was defective, or where the corporation was formed by the consolidation of two other corporations and it was alleged the consolidation was irregular or defective in some particular, the State may be deemed to have waived the right to complain of the omission, failure or irregularity affecting the existence of the corporation by an enactment of the legislature expressly curing or obviating the grounds of complaint, or directly recognizing the corporation as entitled to exercise corporate functions, after the failure, omission or defect complained of had become known, or such waiver may be deemed to exist from long-continued failure of the judicial department of the government to enforce the forfeiture. The principle is, the sovereign shall not be allowed to deny that a *de facto* corporation is a corporation *de jure* if the corporation has attempted to perfect a legal organization but has failed to comply with some condition precedent, or has failed to proceed regularly and lawfully in some other respect touching its organization, if the sovereignty from which came the grant authorizing the formation of the corporation had knowledge of such failure, and by the express act of the legislature remits the penalty of forfeiture or recognizes the corporation as legally organized and lawfully exercising corporate functions, or if the judicial department of such

sovereign omits, for an unreasonable time, to enforce the forfeiture.

We have examined the various cases cited by counsel for appellee as in support of the defense of waiver and acquiescence in the case at bar, and do not find that in any of them the defense has been deemed available, as against the sovereign or State, except in case where the right and title of a corporation to corporate existence was questioned because of some defect in the original charter, irregularity in the proceedings for the organization of the corporation, or its failure to perform or fulfill some condition precedent to its legal organization. In such cases, if the conduct of the sovereign be such as to constitute an admission of knowledge of the defect or omission, and a declaration that forfeiture is not insisted upon, it will be deemed, as in other breaches of conditions, the right to declare the forfeiture for such default, omission or breach has been waived, or, in such cases, forfeiture may be denied on the ground of acquiescence arising from long and unreasonable failure of the judicial department to test the legal organization and existence of the corporation. In the case at bar the appellee is conceded to be a corporation *de jure*, and the complaint is it had assumed and exercised, and is assuming and exercising, powers not granted by its charter or implied by law. We find from its pleas the corporation is without lawful authority to perform the acts complained of; that it entered upon the performance of such acts in 1880 or 1881, in pursuance of a fully matured plan; that it has since continuously engaged in this unjustifiable undertaking, and was so engaged when the information was filed, and that it owns a tract of land twenty-three acres in extent which it is holding for the express purpose of building thereon other dwellings and tenement houses, opening streets, alleys, etc., and extending said town or city of Pullman over said tract of land. The usurpations of the corporation are not only those of the past but also those of the present,

and its plea admits it contemplates a repetition of the offenses in the future.

Our interpretation of the law, as applied to facts appearing from the averment of the pleas, is, that the appellee corporation, at and before the time of the filing of the information, was exercising powers and performing acts not authorized either by the express grant of the charter or any implication of law; and further, that by some of such unauthorized acts the corporation assumes and exercises powers and functions which the general law of the State contemplates shall be possessed and exercised only by municipal authorities of cities or towns and the public school authorities, and that other of its unauthorized acts tend to restrain competition in various branches of trade, to remove real estate from the operation of our Statute of Descent and place the title thereto in a corporation having perpetual succession and unending existence, and thereby withdraw it from the channel of trade and commerce; to create monopolies in the business of selling the necessaries and comforts of life, and that its acts and doings are opposed to good public policy. We do not think the demand of the sovereign that usurpations so clearly antagonistic to good public policy shall be restrained can be defeated by any imputation of *laches,* or upon the ground that acquiescence is to be inferred from the failure to invoke the aid of courts at an early day.

Nor do the averments of the plea with reference to the acts of the General Assembly present a ground of defense. If the General Assembly of the State has, by a later enactment, extended the power of the corporation, the enactment should have been pleaded as was the original charter. The averment, "the doings of the corporation in regard thereto (the acts complained of) were the special subject of investigation and report," is but pleading matter of conclusion, and availed nothing by way of defense. Whether held by virtue of its express or implied power or by usurpation, all the real property in

question was properly subject to assessment for purposes of taxation. The duties of a committee appointed by the legislature to investigate the property of the corporation and ascertain if all of its property was properly subjected to taxation did not involve an investigation into the title or right by which the corporation claimed to hold the real estate, and the approval by the General Assembly of the report of such a committee that the property of the corporation was properly taxed would not amount to the concession on the part of the State that the corporation had a right to acquire the title to the real estate in question, nor is it sufficient to show the State had knowledge that the real estate had been acquired without lawful power, and therefore held to constitute legislative recognition and waiver of the acts of usurpation.

Our conclusion therefore is, the court erred in overruling the demurrer to such of the pleas or parts of pleas as were pleaded in response to and as in defense of the charges in the information which are set forth in this opinion as Nos. 2, 3, 4, 5, 6, 7, 8, 9, 10, 11, 12, 14, 19, 22 and 24, and that otherwise the ruling of the court upon the demurrer was correct.

The judgment must be reversed and the cause remanded, with directions to the circuit court to sustain the demurrer to the pleas as hereinbefore indicated and in other respects to overrule the same, and to proceed further as may be in conformity with this opinion.

*Reversed and remanded.*

CRAIG, WILKIN and CARTWRIGHT, JJ., dissenting:

We do not concur in the foregoing opinion adopted by the majority of the court. The principal charges of usurpation made against appellee consist in the construction of dwelling houses sufficient for the comfortable occupancy of its employees; maintaining and furnishing, without charge to its employees, parks, flower beds, recreation

grounds and other like means of enjoyment; building and furnishing to them rooms for a public library free of rent, and churches, a lecture room, theater and concert hall at a nominal sum; owning rooms rented to the board of education for schools, and rooms for the sale of groceries and necessaries, and furnishing heat, light and water to some of the occupants and providing for proper sewerage. The extent to which these things are done, and their purpose and connection with the successful prosecution of the business which appellee was chartered to carry on, are set out in the amended pleas and substantially stated in the foregoing opinion. The matters so alleged in the pleas are admitted by the demurrers to be true, and if they show the acts complained of to be reasonably necessary in order to enable appellee to carry into effect the powers expressly granted to it and to enable it to accomplish the purposes of its creation, then they are within its implied powers, and no less lawful than those expressly authorized.

By its charter the defendant is vested with all powers, rights, privileges and immunities incident to corporations, and necessary or useful for the purposes of the incorporation; with power to manufacture, construct and purchase railway cars, with all convenient appendages and supplies for persons traveling therein, and the same to sell or use, or permit to be used, in such manner and upon such terms as the company may think fit and proper; and to purchase, acquire and hold such real estate as may be deemed necessary for the successful prosecution of the business of the company, and to sell and convey the same.

The trial court, in its opinion, quotes with approval—and we concur in such approval—the general rules and principles of law applicable to the matter of the implied powers of corporations, as they are stated in the brief of counsel for appellee. That statement is as follows: "It is axiomatic that corporations have not only the powers expressly granted but those which are necessarily im-

plied; that while they derive all their powers from the legislature which creates them, it is also true that what is fairly implied is as certainly granted as what is expressed; that unless restrained by their charters they have the power to deal precisely, in carrying out the corporate purposes, as individuals seeking to accomplish the same ends; that they may 'resort to any means that would be necessary and proper for an individual in executing the same, unless they be prohibited by the terms of their charters or some public law from so doing;' that while, in regard to their express powers, the grants are construed most liberally in favor of the State and most strictly against the corporation, yet in regard to incidental powers neither strict nor liberal, but only reasonable, rules of construction are applied; that corporations may so far develop and extend their operations as to engage in matters not primarily contemplated by their founders, provided these matters be fairly within their scope, and provided, also, that in so developing and extending their undertakings they employ direct, and not indirect, means; that different rules of construction are to be applied to charters of corporations organized under special acts and those organized under a general law, the greater strictness of interpretation being employed in dealing with the latter; that 'necessary,' when used in defining the powers of corporations, does not mean what is simply indispensable, but also what is useful, convenient and proper to carry into effect the franchises granted. —1 Spelling on Corp. secs. 68, 73, 75, and cases cited; Green's Brice's Ultra Vires, pp. 66, 71, 73, 75, 87, 91, and cases cited; *Curtis* v. *Leavitt*, 15 N. Y. 9; *Union Bank* v. *Jacobs*, 6 Humph. 525; *Railroad Co.* v. *Berks County*, 6 Pa. St. 70; *P. & S. Railroad Co.* v. *Lewis*, 33 id. 33; *New England Fire and Marine Ins. Co.* v. *Robinson*, 25 Ind. 541; *Brown* v. *Winnisimmet Co.* 11 Allen, 326; *Old Colony Railroad Co.* v. *Evans*, 6 Gray, 25; *McCulloch* v. *Maryland*, 4 Wheat. 316; *State* v. *Hancock*, 35 N. J. L. 537; *Crawford* v. *Longstreet*, 43

id. 328; *Ellerman* v. *Railway Co.* 49 N. J. Eq. 217; 2 Cook on Stockholders, (3d ed.) sec. 681." See, also, *Madison, etc. Co.* v. *Watertown, etc. Co.* 5 Wis. 173, and *Clark* v. *Farrington,* 11 id. 321.

In the case of *Curtis* v. *Leavitt,* 15 N. Y. 9, it was held that corporations, along with their specific powers, take all the reasonable means of execution,—all that are convenient and adapted to the end in view; that the corporation has a liberty of choice amongst those means, and that if, in the exercise of such liberty, an intelligent good faith is used, then the power to select the means adopted cannot be called in question.

In *State* v. *Hancock,* 35 N. J. L. 537, it was said by Chief Justice Beasley: "Power necessary to a corporation does not mean simply power which is indispensable. Such phraseology has never been interpreted in so narrow a sense. There are few powers which are, in the strict sense, absolutely necessary to those artificial persons, and to concede to them powers only of such a character, while it might not entirely paralyze, would very greatly embarrass, their operations. Such, in similar cases, has never been the legal acceptance of this term. A power which is obviously appropriate and convenient to carry into effect the franchise granted has always been deemed a necessary one." And further said: "The term comprises a grant of the right to use all the means suitable and proper to accomplish the end which the legislature had in view at the time of the enactment of the charter."

There is a substantial agreement in the authorities as to the general doctrine of the implied powers of corporations. That doctrine has been stated in various forms, but they amount, in substance, to one and the same thing. As formulated in the brief of appellant it is as follows: "A corporation can only exercise such powers as may be conferred upon it by the legislative body creating it, either in express terms or by necessary implication, and the implied powers are presumed to exist to enable it to

carry out the express powers granted." In the case of almost every corporation its implied powers are more numerous and of greater importance than those expressly granted in its charter. No rule can be stated by which can be determined with exactness just what the limits of the implied powers of corporations are. These limits depend largely upon the nature of the corporation, its necessities and the surrounding circumstances. While grants of power are strictly construed as to those expressly granted, yet in executing such express powers the corporation has an implied authority to carry such express powers into full effect, and for that purpose may adopt any means, not prohibited by law, that are necessary, usual, convenient, reasonable or suitable for accomplishing the objects of the incorporation; and in respect to these implied powers, the rule of strict construction that obtains in the case of an express grant of power has no application, but the rule of a reasonable construction prevails.

Principal among the express objects for which the defendant was incorporated was that of manufacturing and constructing railway cars, with all convenient appendages; and for the accomplishment of such purpose it was expressly given power to purchase, acquire and hold "such real estate as may be deemed necessary for the successful prosecution of their business," and along with it "all powers, rights, privileges and immunities incident to corporations, and necessary or useful" for the accomplishment of such purpose. We have seen that the rule is, that while a corporation can exercise no powers other than those conferred by its charter, and cannot engage in any separate and unauthorized business, yet that it has a right of selection as to the means to be used in carrying into effect the expressly delegated powers, the only restriction being that they shall be necessary, in the sense of being suitable, convenient and reasonable, and not in contravention of any rule of law.

In the leading case of *McCulloch* v. *Maryland*, 4 Wheat. 413, it is said by Chief Justice Marshall, among other things, that to employ the means necessary to an end is generally understood as employing any means calculated to produce the end, and not as being confined to those single means without which the end would be entirely unattainable; that it is essential to just construction that many words which import something excessive should be understood in a more mitigated sense—in that sense which common usage justifies; that the word "necessary" is of this description; that it has not a fixed character peculiar to itself, but admits of all degrees of comparison, and is often connected with other words which increase or diminish the impression the mind receives of the urgency it imports.   In the case now at bar, the power given the defendant by the sixth section of its charter is not simply to purchase, acquire and hold such real estate as may be necessary for the purposes of the incorporation, but such "as may be *deemed* necessary for the *successful* prosecution of their business."   It would seem, from the rule, that it is not to be presumed that the legislature used idle and useless words, and, from the reasoning of Chief Justice Marshall in the case above mentioned, that some force and effect should be given to the words "deemed" and "successful," used in said act. Without these words the act gave to the defendant the right to purchase, acquire and hold not only such real estate as was absolutely indispensable for the purposes of the corporation, but also such as was useful, convenient, reasonable and proper in the conduct of the business for which it was incorporated.   The use of the words mentioned, even if it does not otherwise amplify the power, is at least an indication of an affirmative legislative intention that the corporation should have and exercise some degree of discretion in respect to the amount of real estate it should acquire and hold,—the same to be, as matter of course, not an unlimited and unbridled

discretion, but a discretion to be exercised in good faith and within reasonable limits.

It appears from the pleas, admitted to be true, that the work of construction was completed in the year 1881, and since that time appellee has carried on its business and exercised the powers now claimed, and the dwelling houses have been occupied by a population of about ten thousand people. It was a conspicuous movement, which attracted general attention and widespread discussion. The provision made by appellee for those in its employment and their families, both as to dwellings and surroundings contributing to their comfort and elevation, was well and generally understood. The plan was carried on for fourteen years, and the powers in question were exercised without attack or question from the State. The charges now brought against it seem to be incited by its proportions and great business success, rather than because of any sound legal objection. From the fact that it satisfactorily supplied a necessity consequent upon the rapid development of a new country and the increase of commerce and travel occasioned by the building of railroads, and by means of wise and discreet management and the adoption of economical methods of business, it has, in a comparatively few years, grown from a company with $100,000 of capital stock to a large, wealthy and prosperous corporation with a capital stock of $36,000,000, and with an amount and value of real estate and other property commensurate with the amount of capital it has invested and the extensive business in which it is engaged. If the various implied powers that it has availed of had been exercised by a less wealthy and pretentious corporation, it is hardly probable that the right to exercise such powers would ever have been called in question. In fact, it seems to us that the only difference in that regard between those used by the corporation now at bar and those which are and long have been exercised by the numerous mining companies, lumber companies,

manufacturing companies, and other companies incorporated and doing business in this State, is a difference that is not based upon any sound legal distinction, but merely one that arises from the vast amount of business done by the defendant. The difference is merely as to the extent to which it has become necessary or expedient to use such implied powers. If a lumber company, with a few thousand dollars of capital stock, may, without express power in that regard and under and by virtue of its implied powers, construct a dozen or twenty frame dwellings for the use of the employees at its saw-mill, and if a coal mining company, with a comparatively small capital stock, may in like manner build fifty or a hundred houses and cottages to be occupied by the families of those who work in its mines, it is difficult to see why, upon principle, the defendant, if the nature and magnitude of its business reasonably require it, may not construct 2200 buildings and tenements suitable for the occupancy of the class of workmen that the nature of its business requires. And if the lumber or mining company, not for the purposes of profit, but merely for the accommodation of its workmen and for the purpose of inducing them to enter and remain in its employment, can build a log school house in which the children of its employees may be educated or church in which such employees and their families may worship, it is not perceived why, upon principle, the defendant has not the implied power to do all that it has done or is doing in respect to the school houses and churches of which complaint is made. It is a matter of common and general knowledge that in this State, and continuously from the days of the earliest development of its resources, lumber and saw-mill companies, mining companies, manufacturing companies and other like corporations have, without question, constructed and used, not for purposes of speculation in real estate, but as a necessary and convenient means for carrying on the several kinds of business for which they were respectively

incorporated, houses to be used by their servants and employees as habitations for themselves and their families; and hotels and boarding houses for the accommodation of such servants and employees as had no families, and of such other persons as were temporarily called, for the purpose of transacting business with such corporations, to the localities where their business was being carried on; and structures to be used as churches or school houses for the benefit of their employees, their families and children.    There is no difference between what always has been done and is still being done by these various corporations and that which this defendant has done and is still doing, except this: that owing to the very large and extensive proportions to which the plant and business of the defendant have grown, a much larger number of houses and tenements is required for the accommodation of its employees, and that, owing to the fact that the best class of skill and labor is necessary in the construction of its products, and the proximity of the plant to a large city, a better class of tenements, supplied with more of the conveniences and comforts of life, is required in order to attract and obtain such better class of skilled employees.

In *Vermont Central Railroad Co.* v. *Burlington,* 28 Vt. 193, a question of the exemption of certain property of the company from taxation was raised.    The court held that only such of said property as the company was authorized to take without the consent of the owner was so exempt, but in their opinion said: "They may at the same time hold, by gift or grant, woodland for fuel, or land on which to erect tenements for those under their employment, and for various other purposes connected with the use of the road, and to which that exemption does not apply."

In *State* v. *Commissioners of Mansfield,* 3 Zab. 513, the railroad company owned houses and lots which were let by it to its workmen and employees, and the question involved was the right of exemption from taxation.    The

court decided against the claimed exemption, but in its opinion recognized the right of the corporation "to purchase land and to erect houses in the right location and of the right kind for all their constant employees."

In *Crawford* v. *Longstreet*, 43 N. J. L. 325, the question was as to the right of a turnpike company to lease and use premises on which was a house occupied by its servants, and other conveniences used by the company. The court held that such right was one of the implied powers of the corporation, and said that while a habitation for the company's servants and laborers was not strictly indispensable, yet "that such an arrangement was convenient, useful and essential to the proper management of its business scarcely admits of denial."

In *Locey Coal Mines* v. *Chicago, Wilmington and Vermilion Coal Co.* 131 Ill. 9, the right of the coal company to own the property there in question was not raised or specifically involved, but the court in its opinion distinctly recognizes that the thirty dwelling houses, boarding houses, storehouse and various other buildings connected with the mines were properly a part of its property, and "desirable and necessary for carrying on its business of mining and selling coal."

In *Moss* v. *Rossie Lead Mining Co.* 5 Hill, 137, the company was incorporated "for the purpose of raising and smelting lead ore at Rossie." It first engaged only in the business of raising ore, the smelting being done by Moss & Knapp. It subsequently bought the property of Moss & Knapp, which included a house and lot, fifty acres of improved land, on which were several houses used as residences for workmen, stoves in the houses, a building which had been occupied as a store, a school house, a threshing machine, etc. In the opinion of the court it is said: "If articles bought by a corporation cannot possibly be of any use in the line of their corporate business, but the purchase is necessarily an excess of power, a question might be raised on that ground. Yet in dealing

with corporations created for manufacturing purposes, who that does not make a part of them shall be holden to penetrate the ramifications of their business so as to fix the boundary of possible utility? Such a company as the defendant's must have lands, houses and wood, as well as mines, machinery and utensils. They may resort to all the ordinary means of paying workmen and providing them and their families with residences; and who would deny, in this country of schools, that they may pay by providing school houses and school masters for the children of workmen?"

In the subsequent case of *Moss* v. *Averill*, 10 N. Y. 449, which involved the same facts as those in the case last cited, and which also involved the question of *ultra vires*, it was said: "The purchase of the property of Moss & Knapp, for which the notes in question were given, was within the scope of the legitimate business of the company. * * * They did not embark in any other business than that for which they were incorporated. The property they purchased had been got together by Moss & Knapp for the smelting business, and nothing else, and was necessary to carry on that business. It was situated in a new country, at a distance from any village, and required for the accommodation of their hands the erection of suitable habitations. The country was a wilderness and had to be cleared. The men and animals employed by them had to be supported. If they raised a little grain on their clearings, it must be harvested and prepared for food or it would be lost." And further said: "One of the shanties had been used by Moss & Knapp as a school house for the children of their men. Whether it was so used at the time of the purchase does not appear. It would have been no objection to the validity of the sale had it been at that time devoted to so laudable an object."

In *Searight, Thornton & Co.* v. *Payne*, 6 B. J. Lea, 283, the Worley Furnace Company, an incorporated iron company, owned and operated a "supply store" in connection ·

with its furnace, and which was not expressly authorized by the company's charter. The court held that it might be fairly included in the powers of the corporation.

In *Texas and St. Louis Railroad Co.* v. *Robards*, 60 Tex. 546, it was held that the railroad company might, under the circumstances of that case, make a contract for the building of a hotel. Among other things the court said: "The power of a corporation to contract extends not merely to such subjects as are absolutely essential or indispensable to the performance of specified acts authorized by its charter, but also to such (not being prohibited by law nor against public policy) as are designed and may be useful in promoting the main enterprise."

In *Watt's Appeal*, 78 Pa. St. 370, the right of a land and improvement company, under the circumstances of that case, to erect a hotel was sustained.

Section 362 of Morawetz on Private Corporations (2d ed.) is as follows: "It is a well established general rule that a corporation may carry on the business for which it was chartered, in the manner in which a business of that particular kind is usually carried on. What the usual manner of carrying on a business is, cannot be determined by the application of purely legal principles. It is a question of fact, and not a question of law. Evidently, therefore, it is impossible to decide abstractly that acts of a particular description are within or without the chartered powers of a corporation. The right of a corporation to perform an act depends, in every case, upon all the surrounding circumstances. No act is authorized under all circumstances, and facts can be conceived which would render almost any act justifiable. Thus, a railroad company may usually buy coal and material for constructing its road; but it would have no authority to buy coal or anything else as a speculation, with the intention of selling it again. On the other hand, it would clearly be unauthorized, under any ordinary state

of facts, to use the funds of a railroad company for building a church or a theater, yet this use of the corporate funds might be entirely justifiable if a church or a theater were required for the use of the company's workmen, in a part of the world where no church or suitable place of recreation was accessible."

*Mayor of Norwich* v. *Norfolk Railway Co.* 4 El. & Bl. 396, was a case in which one of the pleas raised the question of the implied powers of the corporation. The question of *ultra vires*, however, was not decided by the court, as the decision of the case turned on another ground. The four judges delivered separate opinions, from two of which we quote, on account of the applicability of the language used to the case now at bar. Coleridge, J., said: "When one considers the immense extension and increase of corporate bodies in modern times, the vast variety of purposes for which they are created, the complication of circumstances under which they are to act, the liability to error in the formation of prospective plans as to detail, and the ever-arising improvements in the means and appliances of mechanics and science, it would seem that public convenience and policy, as well as good sense and justice, require that, within the limits of a substantial adherence to purpose, the empowering clauses of incorporating instruments should be construed largely and liberally, so as not to defeat the purpose by a too narrow restriction of the means." And Erle, J., in reasoning to his conclusion that the act complained of was not *ultra vires*, said: "The question put in the course of the argument, 'would a contract by a railway company for a theater or chapel be void,' exemplifies the doctrine. It would or it would not, according as the purpose of the contracting parties was or was not connected with the railway. It might be a speculation, separate from the railway and prohibited; or if works were wanted in a waste place, and the company found it to be for their

interest to build a town and supply it with all requisites for inhabitancy, and, in order to secure a permanent supply of workmen of skill and responsibility, added a chapel and a theater, with religious and secular instruction, it might be for the purpose of the railway, and valid, and though distantly connected, the outlay might be found eventually to increase the profit from the traffic."

In view of these authorities and expressions of judicial opinion, and in the light of the custom that has always prevailed and still prevails in this State with corporations organized for mining, lumber and manufacturing purposes, we are of the opinion that the powers now under consideration, exercised by the defendant in the prosecution of its legitimate business, while they may go to almost or quite the full extent of implied powers that it is authorized to use, still do not, under the circumstances under which it has been placed and under which it now does business, amount to usurpations of power of which the State has the right to make complaint.

As already suggested, it is admitted by the demurrers to the pleas that the matters alleged therein are true. The statements thus admitted preclude any conclusion that defendant built the houses and tenements, church, school houses and other structures at Pullman for purposes of speculation or investment, but, on the contrary, show that all that has been done by it in that behalf has been in furtherance of its business of manufacturing, selling and operating railroad cars. In considering as to whether particular acts of a corporation are within its implied powers, it is necessary to consider not only the purposes for which it was chartered, but also the particular circumstances under which it is called upon to act. As said by Morawetz in the quotation above made from his work on Private Corporations: "The right of a corporation to perform an act depends, in every case, upon all the surrounding circumstances. No act is au-

thorized under all circumstances, and facts can be conceived which would render almost any act justifiable." If we take the case at bar,—that of a car manufacturing company,—and, without any explanation therefor and as an isolated fact, find that it has erected a church; a school house or a building to be used as a meat market or family grocery store, it might appear that the building of such church, school house, meat market or storehouse was not within the implied powers of the company. If, however, we take into view a large corporation, in the successful prosecution of whose business the labor of thousands of skilled workmen is required and which is confessedly pursuing the objects of its incorporation, and then find that its plant, for reasons of such cogency as are set forth in the pleas herein, was located at a place where there were no churches, schools or stores, and that in order to attract to it and hold the best and most skilled class of workmen and artisans, the labor of such class of operatives being absolutely essential for the work in which it was engaged, it should erect a school house, church building, house to be used for stores and family supply-shops of various kinds, and other like necessary accommodations, and that it did so, not for the purpose of speculating in real estate or of merely making a remunerative investment of capital, but in good faith for the purpose of promoting the success of its authorized business of manufacturing and dealing in railway cars, then the erection of such structures may fairly be considered to be within the implied powers of the company.

The foregoing authorities and reasonings apply with equal force to all the various uses to which the Arcade Building and Market Hall, erected by defendant, are devoted, and to the fifty acres of land, of which a part is used by defendant's employees as recreation grounds, with their appliances for athletic exercises, a part for pleasure grounds and park, with greenhouse and other like accessories, and the remainder for streets and alleys.

There can be no question but that it was fully within the powers of the defendant to construct a gas plant for the purpose of furnishing light in the buildings which it used in its manufacturing business; a water tower and mains for supplying its various shops with water; and a plant for generating steam to be used in manufacturing its products and in heating its shops. This being so, it is difficult to perceive any sound reason why it might not use any surplus gas that was produced, for the purpose of lighting its own buildings occupied by its own employees; or why a small percentage of the water that passed through its water tower and mains, that could not be utilized for strictly manufacturing purposes, might not be furnished to such employees so occupying said houses and who could not get a supply of water in any other way; or why it might not apply any surplus steam that it generated, to heating such houses, or sell the same for a valuable consideration to some other person or corporation.

In *Brown* v. *Winnisimmet Co.* 11 Allen, 326, which involved the right of a ferry company to lease a steamboat which it did not at that time require for use in its own business, the court held that such act was not *ultra vires,* and said, referring to a manufacturing company by way of illustration: "But no one could doubt that it would be within the scope of its powers to allow another person or corporation, for a reasonable compensation, to draw surplus water from its mill-pond, or to employ that portion of its steam power which was not required for its own use." Holding the same principle are *Lafond* v. *Deems,* 81 N. Y. 508, and *Simpson* v. *Westminster Palace Hotel Co.* 8 H. L. Cas. 711.

In *Lyde* v. *Eastern Bengal Railway Co.* 36 Beav. 10, it was held that if the use of a boat by the railway company was really to assist the traffic on the existing railway it was lawful and proper, but that if the object was to extend

the traffic to places beyond the railway, which the railway was never intended to reach, then it was illegal and beyond the powers of the company; and the court said that a railway company, for the purpose of obtaining coals cheaper than by purchase, might operate a coal mine, and that it might obtain a profit by the sale of such coals as were not required for the use of the company, provided the principal object of the colliery was to supply itself with coal, and not the selling of coals.

If the defendant, in addition to its right of constructing shops in which to conduct the business of manufacturing railway cars, had also the implied power to erect such dwelling houses as were necessary to furnish residences and homes for its employees and their families, and buildings and stores in which could be kept and sold such supplies and provisions as were necessary for their maintenance and sustenance, and halls and other places in which they might worship and their children be educated, and halls and grounds that they might use for purposes of exercise, recreation and amusement, then, of course, from the very necessity of the case, it had and has the right to own and hold such real estate as is reasonably required for the purpose of placing thereon the various structures and other things above mentioned. And, as we have already seen, among the powers expressly granted to defendant in its charter are these: "To purchase, acquire and hold such real estate as may be deemed necessary for the successful prosecution of their business," and the privilege of exercising "all powers, rights, privileges and immunities incident to corporations and necessary or useful for the purposes of the act." When the defendant built its shops and dwelling houses at Pullman, it had the right, as incident to its right to build the same,—and, indeed, it became its duty,—to devise some means to carry off the sewage from said shops and houses, in order to insure their cleanliness and to guard the health of the

workmen and their families.   It was competent for the defendant to employ the means best adapted to that purpose, and if, in carrying out the plan adopted, it became necessary to purchase land on which to empty the sewage, it was within its power to do so.   Possession of the land was essential, for it could not otherwise exercise its right to drain off the sewage in the best and most effective manner.   The fact that the defendant sees fit to utilize said land by raising vegetables thereon is of little importance.   At all events, it is sufficiently answered by the averment in the plea that it raises and sells the same for the purpose of helping to defray the expense of maintaining its sewerage system, which it only in part pays. This is merely the exercise of sound business judgment and economy in not letting go to waste what may be made productive.

There is nothing in these pleas which leads us to believe that public policy would be in any manner served by destroying the plan carried on without objection from the State for fourteen years, resulting in no wrong or injury to any one.   Appellee does not now, and never did, manage or operate the churches, schools or stores nor have any interest in them, and never attempted to exercise any control in public or municipal affairs.   The streets are public highways, and the school buildings are under the control and management of the board of education of the city of Chicago for school purposes, under arrangements satisfactory to them.   We are not prepared to condemn as usurpations of power the furnishing by appellee to its employees of comfortable and attractive homes, with the surroundings of parks, churches and public library, not for motives of investment or gain, but, as alleged and admitted, with the object of appealing to the better and more skillful workmen and securing and retaining them in its employment.