The Independent Order of Svithiod, Defendant in Error, v. Ring Lodge No. 8, Independent Order of Svithiod et al., Plaintiffs in Error.
Louis Biegler Company v. Ring Lodge No. 8, Independent Order of Svithiod et al., Plaintiffs in Error.

Gen. No. 34,553.

Opinion filed April 6, 1931.

McKinney, Lynde & Grear, for plaintiffs in error; George H. Grear and John H. Smalley, of counsel.

Joseph G. Sheldon, for defendant in error.

Mr. Presiding Justice Matchett delivered the opinion of the court.

This writ is prosecuted by Fred Person and Union Foundry Works, defendants, to reverse a decree entered in favor of complainant, Independent Order of Svithiod, upon a bill to foreclose a trust deed. The cause was consolidated with another suit brought to foreclose an alleged mechanic's lien in favor of Louis Biegler Company against the same premises. The principal defendant was Ring Lodge No. 8, a corporation, one of the subordinate lodges of the complainant, to which a loan was made by complainant for the purpose of providing funds for the construction of a building.

The consolidated causes were put at issue and referred to a master, who reported in favor of complainant, finding an indebtedness due to complainant secured by a trust deed in the sum of $223,424.82. There were a number of defendants claiming liens. As to some of these it was found that they had no liens, and

as to all who were held to have liens it was found that the same were subordinate to the lien of complainant under the trust deed.

The money loaned was a part of a so-called "reserve fund" raised by complainant through the levy of assessments upon its members, and defendants contend here, as they contended in the trial court, that complainant is without power to levy such assessments and without power to lend the money so accumulated. In other words, these lien claimants urge the defense that the loan, the notes representing the indebtedness, and the trust deed securing the same, are ultra vires the powers of the complainant corporation, and that the exercise of these powers is ultra vires to such an extent that they, the lien claimants, have the right to raise the question collaterally. A second contention is made that the loan is a mere fiction because the defendant Ring Lodge is an integral part of the complainant corporation, and that the loan in substance was made to complainant itself. The defense, however, upon which these defendants rely, is that of ultra vires, and for a proper consideration of that defense it is necessary that the facts which for the most part are uncontradicted should be recited.

The Independent Order of Svithiod is a corporation organized under the General Incorporation Law of the State of Illinois pertaining to corporations not for pecuniary profit, approved April 18, 1872, and in force July 1, 1872, Cahill's St. ch. 32, ¶ 159 *et seq.* It was incorporated in August, 1881, and a charter was issued to it which stated that the objects for which it was incorporated were as follows:

"First. For the purpose of assisting its members when sick and during its continuance, in accordance with By-laws to be established hereafter.

"Second. Upon the decease of any member to levy an assessment upon every member of any amount to be established by the By-laws to be hereafter enacted

as aforesaid, said amount payable to the widows, orphans and devisees of said member.

"Third. And for educational and social purposes which trustees hereinafter mentioned may see fit to establish."

At the time this Order was incorporated the statutes of the State of Illinois contained no provisions for the organization or control of what is now known as fraternal beneficiary societies other than the provisions in the statute of July 1, 1872, under which complainant was incorporated. That statute, however, provided in substance that societies which were intended to benefit orphans, widows, heirs and devisees of deceased members thereof where no annual dues or premiums were required and where the members received no money as profit or otherwise, should not be deemed insurance companies—meaning, as we think it must be agreed, that such a corporation should not be under the control of the State to the extent of being subject to the supervision of the insurance department. No amendment to the charter of the complainant corporation has ever been filed in the office of the Secretary of State of the State of Illinois. Complainant has functioned as a fraternal order from the time of its incorporation, and has now become an organization composed of a grand lodge which has many subordinate lodges whose members are members of the complainant organization.

In April, 1901, complainant filed an application with the insurance department of the State of Illinois for a license to do business under the Fraternal Societies Act of 1893, and the license was granted. Thereafter regular monthly assessments were levied upon all members of the complainant society upon a level rate basis and the excess over the amount required to pay current death benefits was deposited by the complainant organization in a reserve fund. Since 1914 complainant has been collecting monthly assessments from

all its members based upon the rates of the fraternal insurance companies and has been actually engaged in doing a mutual benefit or fraternal insurance business. Through the retention and accumulation of the excess of such regular monthly assessments over the amount required to pay current death benefits, a reserve fund of about $1,250,000 has been created and is now held by such complainant organization.

Section 1 of the act of June 22, 1893 (see Laws of Illinois, 1893, p. 130, Cahill's St. ch. 73, ¶ 488 *et seq.*) provided:

"That a fraternal beneficiary society is hereby declared to be a corporation or association, formed or organized and carried on for the sole benefit of its members and their beneficiaries, and not for profit. . . . All such societies shall be governed by this act, and shall be exempt from the provisions of all insurance laws of this State, and no law hereafter passed shall apply to them unless they be expressly designated therein."

The second section provided:

"All such societies coming within the description as set forth in section 1 of this act, organized under the laws of this or any other State, province or territory, and now doing business in this State, shall be considered duly organized and may continue such business: *Provided,* that they hereafter make application for such permission and comply with the provisions of this act regulating annual reports, and the designation of the Auditor of Public Accounts as the person upon whom process may be served as hereinafter provided."

Section 13 thereof provided:

"Any person who shall act within this State as an officer, agent or otherwise, for any society which shall have failed, neglected or refused to comply with, or shall have violated any of the provisions of this act, or shall have failed or neglected to procure from the

Auditor of Public Accounts proper certificate of authority to transact business as provided for by this act, shall be subject to the penalty provided in the last preceding section for the misdemeanor therein specified. . . .''

The preceding section referred to provided for a fine of not less than $25, nor more than $200, or by imprisonment in the county jail for not less than 30 days nor more than one year, or by both such fine and imprisonment, in the discretion of the court. Section 14 of the act repealed all laws or parts of laws in conflict therewith.

When in April, 1901, complainant made application to the proper authority of the State for license to continue transacting business under the provisions of this act, the license being granted, the constitution of the complainant society was changed with reference to beneficiaries and death benefit certificates so as to comply with the provisions of the act in question. Paragraph 5 (a) of Article XVI was amended so as to provide:

"The person or persons named in the death beneficiary certificates are primarily entitled to the death benefit, still a member shall have the right to designate as beneficiary only a member of the family, some person or persons related by blood or dependent upon the member for support."

The act of 1893 contained no specific provision which authorized the creation and maintenance of a reserve fund. In 1901 section 1 of the Fraternal Beneficiary Societies Act was amended so as to provide:

"Any such society, order or association may create, maintain and disburse a reserve fund in accordance with its constitution and by-laws. Such reserve fund, if any, shall represent certain prescribed accumulations or percentage retained for the benefit of its members or their beneficiaries, and no part thereof shall be

used for expenses, nor for any purpose except the payment of death and disability claims.''

Thereafter laws were passed by the legislature regulating and controlling the investment of this fund (see Cahill's St. ch. 73, ¶ 512). By an act approved May 20, 1907, Cahill's St. ch. 73, ¶ 519, such societies were authorized to provide for and furnish a free home for certain members, and by another act approved May 10, 1909 (see Cahill's St. ch. 73, ¶ 526) such societies were authorized to create, maintain and operate hospitals, asylums and sanitoriums for the benefit of sick, disabled or distressed members. Paragraphs 2 and 3 of Article XVII of the constitution of complainant as amended provide:

''Par. 2. All receipts from assessments under Art. XVI, Par. 2 (a) not required to pay current death benefit claims shall, by the Treasurer of the Grand Lodge, by order of the Board of Directors, be turned over to the Investment Committee for investment and be added to the reserve fund. Provided, however, that the amount in the mortuary fund shall not be less than $10,000.00.''

''Par. 3. If the funds remaining in the mortuary fund are not sufficient to pay accrued death claims, the Board of Directors shall transfer from the Reserve Fund to the mortuary fund an amount sufficient to pay all accrued death claims.''

The subordinate lodges of the complainant are composed of individual members of complainant and constitute a division or part of the complainant organization. Most of these subordinate lodges are unincorporated. The subordinate lodge through its financial secretary collects all payments which are made by its members, and such portion as under the constitution and by-laws belongs to complainant is turned over to it. The lodge dues are retained by the subordinate lodge for the purpose of meeting sick benefits, funeral

■■■■■■■■■■■■■■■■■■■■■■■■■■■■

benefits, officers' salaries and other incidental expenses. Certificates of membership are issued to the individual members by complainant and bear the counter-signature of the chairman and secretary of the local or subordinate lodge to which the member belongs. The constitution and by-laws of the complainant govern the individual members of the complainant organization and its subordinate lodges as well. The complainant grand lodge is given authority therein to prescribe the ritual and ceremonies, to establish and charter local or subordinate lodges, to raise moneys necessary for the maintenance of the grand lodge by a per capita tax, to make charges for the granting of charters and to raise the moneys necessary to provide and maintain an old members' home by annual assessment to be levied on each member of the Order. Such constitution and by-laws provide that each new member shall pay a membership initiation fee of not less than $2 per member. The grand lodge is given the power to recall and declare null and void the charter of any subordinate lodge and to annul or change at will the by-laws of its subordinate lodges. The constitution and by-laws authorize the complainant grand lodge to issue death benefit certificates for $1,000, $500 or $250, according to the amount designated in the application of each applicant for membership. Each member is required to pay monthly payments in the form of a level rate assessment according to age and amount of death benefit. The constitution and by-laws further provide that if the beneficiaries named in the death benefit certificate are not living upon the death of the member, such benefit shall be paid first to the member's surviving wife or husband; second, to the member's children; and third, to the next of kin of the member according to the laws of the State of Illinois.

Subordinate lodges of the complainant organization by such constitution and by-laws are given only such powers and privileges as allowed by complainant, and

all by-laws of subordinate lodges must be submitted for approval to the complainant grand lodge before becoming effective.

The defendant Ring Lodge No. 8 is a corporation not for profit organized under the laws of the State of Illinois and is a subordinate lodge and part of the organization of the complainant grand lodge. It was incorporated shortly before the real estate in question was purchased by it and thereupon made an application to its parent organization for a loan of $200,000 with which to erect a building. The plans submitted by Ring Lodge No. 8 were examined by the board of directors of the complainant and the loan was granted. Four per cent commission was charged by complainant upon the loan, which was evidenced by promissory notes bearing interest at the rate of 6½ per cent per annum. Practically all money paid out by the complainant on such loan was paid directly to the various contractors constructing the building in question and was disbursed by the complainant directly to such contractors upon architect's certificates passed upon by complainant. The sum of $8,497.93 was deducted from the principal sum of $200,000 for interest, and the sum of $8,000 was deducted as a commission. The balance, amounting to approximately $183,500, was paid out by the complainant directly to the contractors. In addition to the $200,000 real estate loan, $5,000 was loaned by the complainant to defendant Ring Lodge No. 8 on a chattel mortgage covering all furniture in the building. The proceeds of this mortgage were paid directly to the contractors by complainant.

The building as completed is located on Clark Street and Racine Avenue in Chicago and is four stories high. It contains two lodge halls on the top floor, one small hall and an apartment for the janitor on the first floor, and other halls and stores. The lodge halls and stores are rented as far as possible.

The foreclosure was brought about by default in the payment of interest note No. 4, and in the payment of interest notes Nos. 5 and 6, secured by the trust deed, on account of which complainant determined to declare the entire indebtedness due and instituted proceedings to foreclose.

Defendant Person is a member of the complainant Order, a chairman of one of the local lodges and a delegate to its grand lodge, and was one of its directors when the loan was decided upon and made. He was also at that time a member of the investment committee of five directors, whose duty it was to see to it that the interests of the Order in making this loan were fully protected. He was also the president and a stockholder of the Person Construction company, which company had a contract with Ring Lodge No. 8 to furnish the concrete, brick and terra cotta work, and the masonry on the building for the sum of $132,299. Person's claim for a mechanic's lien, which was allowed, for $1,113.08 was founded on his claim for services rendered in issuing the architect's certificates in connection with the building in question, and he received $2,000 out of the $5,000 which was obtained by a chattel mortgage.

The defendants who complain cite many authorities and argue much to the point, that complainant by reason of its failure to amend its charter is without power to create or maintain a reserve fund. We cannot regard that as an issue here nor as an appropriate fact to consider in considering the plea of ultra vires. This suit to foreclose the trust deed is not brought upon any contract either express or implied to pay any assessment for the creation or maintenance of any reserve fund or any other fund. Neither Person nor the Union Foundry Works has any standing to raise that question in this suit. Assuming the funds loaned were obtained unlawfully from members of the Order, this

would not in any way affect the right of complainant to maintain its suit upon the promise of Ring Lodge No. 8 to repay the money borrowed or its right to enforce the security as provided by the deed of trust.

There is, no doubt, abundant authority in Illinois to the effect that a contract which is ultra vires the power of a corporation in the true sense (that is, a power wholly outside of and beyond the purpose for which the corporation was organized) will be held void in any suit brought upon such contract. It was so held in *National Home Bldg. & Loan Ass'n v. Home Sav. Bank,* 181 Ill. 35; *Calumet, etc., Dock Co. v. Conkling,* 273 Ill. 318; *McIlvaine v. Forman,* 292 Ill. 224, which are cited by defendants and upon which they rely. Many other cases might have been cited to the same effect, but as was held by the court in *Leigh v. American Brake-Beam Co.,* 205 Ill. 147, the application of the doctrine of ultra vires is limited to those cases where the party suing relies upon the ultra vires contract. The borrower of money cannot ordinarily, upon default in payment, successfully resist a suit upon the theory that the lender obtained the money loaned in an illegal manner. It would be as reasonable to suppose that a similar defense might be interposed by a defendant to an indictment charging embezzlement; and it has been expressly held that such defense will not avail in *People v. Nachowicz,* 340 Ill. 480.

The collection of this reserve fund by complainant was not *malum in se.* It was not at the time complainant collected it *malum prohibitum,* and the suit complainant brought to foreclose the mortgage was not based upon any promise connected with the collection of any such assessment fund. The plea of ultra vires therefore cannot be interposed on that theory by these defendants. They have no standing to make a collateral attack under these circumstances. *Rector v. Hartford Deposit Co.,* 190 Ill. 380; *People v. Shedd,*

241 Ill. 155; *Golconda Northern Ry. v. Gulf Lines Connecting R. R.*, 265 Ill. 194.

There is left for consideration, however, the further question (which, we think, is the controlling one in the case) whether the power to loan its own money is wholly ultra vires the complainant corporation, (not simply an abuse of a power) but the assumed exercise of a power wholly wanting. If the making of this loan is ultra vires in the sense just described and wholly without the powers either express or implied granted by the State to the corporation in the charter which gave being to it, then the authorities already cited would be applicable and would, if followed, compel a reversal of the decree.

The real question therefore is whether at the time the loan was made by complainant to Ring Lodge No. 8, the whole transaction was wholly without complainant's corporate powers either express or implied. Defendants maintain the affirmative of this proposition and with care and diligence have collected the authorities which they contend compel that conclusion.

It is asserted that the powers of a corporation are derived solely from its articles of incorporation as limited by the act under which it was authorized. *Rockhold v. Canton Masonic Mut. Ben. Soc.*, 129 Ill. 440; *People v. Chicago Gas Trust Co.*, 130 Ill. 268, and *National Union v. Keefe,* 263 Ill. 453, are cited to this proposition and sustain it. It is asserted that where the powers enumerated in the articles of incorporation are not so broad as they could be under the statute authorizing incorporation, the corporation will be restricted to those powers stated in its articles. *Rockhold v. Canton Masonic Mut. Ben. Soc.*, cited above; *Norwegian Old People's Soc. v. Wilson,* 176 Ill. 94, and *Danielson v. Wilson,* 73 Ill. App. 287, are cited to this proposition and we think so hold. Defendants also contend that the constitution and by-laws of a corporation cannot extend or increase the powers

granted to such corporation by the state. *Grimme v. Grimme,* 198 Ill. 265, and *National Union v. Keefe,* 263 Ill. 453, are cited, and we think so hold. It is urged that a corporation has only those powers specificially enumerated in its articles of incorporation and such others as are necessary to carry those express powers into effect. To this effect *Rockhold v. Canton Masonic Mut. Ben. Soc.,* above cited, *People v. Pullman's Palace Car Co.,* 175 Ill. 125, *Murphy v. Nowak,* 223 Ill. 301, *Calumet, etc., Dock Co. v. Conkling,* 273 Ill. 318, and *Society of St. Stephen v. Sikorski,* 141 Ill. App. 1, are cited and so hold. Defendants urge further, that in determining the extent of the powers of a corporation, the statement of such powers in the articles of incorporation and the statute permitting organization will be strictly construed against the corporation. To this point we are referred to *Calumet, etc., Dock Co. v. Conkling,* above cited; *First M. E. Church v. Dixon,* 178 Ill. 260; *Fritze v. Equitable Bldg. & Loan Ass'n,* 186 Ill. 183; *Knights Templars' & Masons' Life Indemnity Co. v. Vail,* 206 Ill. 404, and we think it may be assumed that these decisions sustain the proposition to which they are cited.

However, if all these propositions are conceded to be correct, there remains for consideration the simple question of whether the negotiation of this loan is wholly outside the purpose for which the complainant was incorporated and therefore illegal and void. To the proposition that the amendment of the by-laws would not extend or increase the powers granted this corporation, the cases on which defendants rely as controlling are *Grimme v. Grimme,* 198 Ill. 265, and *National Union v. Keefe,* 263 Ill. 453. We have given careful consideration to both these cases, and without undertaking to state the facts in detail (which would unduly extend this opinion) it will be sufficient for our purpose to point out that in each case the actual question decided was that the *objects* for which the corpo-

ration was organized could not be extended without amendment of the charter, although permission to enlarge was given by the statute. In other words, the question in each of those cases was whether the classes of persons for whose benefit the charter was granted and which classes were specifically enumerated and limited in the charter were *ipso facto* extended by a statute enlarging its powers to such an extent as to increase these classes. There is no claim of that kind or nature here. The classes of persons to be benefited are stated in the charter of the society. The objects for which it is incorporated are (1) to assist all its members when sick in such manner as may thereafter be determined by the by-laws; (2) upon the decease of any member to levy an assessment of an amount to be established by the by-laws to be thereafter enacted, the amount to be payable to the widows, orphans and devisees of the deceased member; (3) for educational and social purposes such as its trustees might thereafter see fit to establish. These objects have not been changed in any way by any amendments made to the charter. It is true that in carrying out the objects for which the Order was formed, the law of the land placed certain restrictions which have since by appropriate legislation been removed, but this legislation would not render any amendment of the charter necessary unless it was desired to change in some material way the objects stated therein.

We are therefore narrowed down to the more precise question of whether the loaning of money which the Order had in its possession was an appropriate exercise of any power for the attainment of the object or objects for which the Order was incorporated. Upon this precise point defendants rely upon two cases—*Leigh v. American Brake-Beam Co.*, 205 Ill. 147, and *Calumet, etc., Dock Co. v. Conkling,* 273 Ill. 318. In the *Leigh* case the corporation whose money

was loaned was a business corporation organized for pecuniary profit and, as the opinion states, "to manufacture and sell or otherwise dispose of brake-beams and other railroad appliances." The power to make the loan of its money was held to be wholly beyond the objects of its charter, and it was held that a recovery could not be made upon the contract although the plaintiff was permitted to recover the amount of money loaned upon the common counts. In *Calumet, etc., Dock Co. v. Conkling,* the corporation in question had been created by a special act of the legislature of 1869. The object of its creation was to construct a canal from some point on the Calumet River to the South branch of the Chicago River, or the Illinois and Michigan canal, which the corporation might determine, and to construct, use, operate, employ and maintain docks, slips, basins, shipyards, dockyards, dry docks, warehouses and piers which the corporation might deem necessary and proper. The corporation was given the right to condemn land for its corporate purposes and to intersect any road, highway or railroad with its canal. It was given perpetual succession and the usual corporate powers to contract and be contracted with, to sue and be sued, etc., and to "purchase, possess and occupy real and personal estate, and may sell, lease and employ the same in such manner as it shall determine . . . and have and exercise all the powers necessary as a corporation to carry out the objects of this act." The corporation never constructed the canal but acquired land of considerable value. Its assets were shown to be worth about $3,000,000. Its only source of income was from the sale of real estate. The claim made by the dock company was that in view of the powers expressly granted, it had implied power to loan money when the loaning was incidental to the exercise of its express powers or where the corporation had surplus funds not required for use in its busi-

ness. The court said that the express power to loan money had not been given and that the power to loan money could not be implied from those which had been granted. In that case, the purchaser of a block of the corporation's land for $15,000 obtained a loan of $50,000 in order to enable him to make the purchase. Such dealing in land was contrary to the public policy of the State, and the loan to the extent of $35,000 was held to be ultra vires the corporation. The decision, however, was by a divided court. There was an able and vigorous dissenting opinion by Mr. Justice Carter in which two other judges concurred.

We do not regard either one of these cases as at all controlling here. The corporations in those cases and the objects and purposes for which they were formed are entirely different in their nature from the complainant organization. The purpose for which the Independent Order of Svithiod came into being was a social purpose and substantially that of furnishing life insurance to its members, although the statute expressly declared that it should not be subject to requirements usually imposed upon such companies. In *Jenkins v. Talbot*, 338 Ill. 441, where a society was organized under a different but quite similar act, it was said: "The early policy pursued by this society spelled certain ruin. Surely no one can have a vested right in a disaster." The creation of a reserve fund and the loaning of the same under the circumstances which would assure an income with safety for the principal was not only appropriate to the stated purposes for which this Order was organized, but, as experience has demonstrated, was absolutely necessary if its functions were to be performed. The distinction between a corporation organized for pecuniary profit and one organized for social welfare is distinct and fundamental, and it by no means follows that the rule applied to a corporation organized for pecuniary

profit, or to one such as the *Calumet, etc., Dock Co.* case, which was created by a special act of the legislature, should be applied to a society such as the complainant Order.

Section 31 of the statute under which complainant society was organized (see Cahill's St. ch. 32, ¶ 161; Hurd's Ill. Rev. Stats. 1874, chap. 32, p. 291) provides that corporations organized thereunder should be bodies corporate and politic capable of suing and being sued; that they might have power to make and enforce contracts in relation to the legitimate business of their corporation, society or association; that they might have and use a common seal, and that they and their successors, by their corporate name, should in law "be capable of taking, purchasing, holding and disposing of real and personal estate for purposes of their organization;" that they might make by-laws not inconsistent with the laws of this state or of the United States, in which by-laws should be described the duties of all officers of the corporation, society or association, and the qualification of members thereof. It further stated:

"Associations and societies which are intended to benefit the widows, orphans, heirs and devisees of deceased members thereof, and where no annual dues or premiums are required, and where the members shall receive no money as profit or otherwise, shall not be deemed insurance companies."

Section 32 (Cahill's St. ch. 32, ¶ 162) provided that these corporations might elect trustees, directors or managers, "who shall have the control and management of the affairs and *funds* of the corporation society or association." Upon the consent of the corporation the directors were given the further power to "borrow money, to be used solely for purposes of their organization, and may pledge their property therefor." In Fletcher Cyc. of Corporations, vol. 2, sec.

948, p. 1900, the general rule applicable is stated as follows:

"Whenever a corporation has the right to hold funds for which there is no present use, it may loan them, in the absence of express restriction, in order to invest them, instead of allowing them to remain idle and unproductive. This is true of insurance companies, annuity companies, benevolent associations, manufacturing companies, railroad companies, etc., having surplus funds."

The doctrine of the text is sustained by numerous authorities, among which are *Farmers' Loan & Trust Co. v. Clowes,* 3 N. Y. 470; *Farmers' Loan & Trust Co. v. Perry,* 3 Sanford, Ch. (N. Y.) 339; *Western Boatmen's Benev. Ass'n v. Kribben,* 48 Mo. 37. The doctrine of the cases cited is approved in Thompson on Corporations, vol. 3, pp. 2180–2184. In Fletcher Cyc. of Corporations, vol. 3, sec. 1619, p. 2701, the author discusses at length the effect of an illegal or prohibited contract, stating in substance that there is a direct conflict in the decisions as to the effect of a charter or statutory prohibition against discounting or lending money on certain securities. The author states that if the statute expressly declares that the securities taken in violation of the prohibition shall be void, the same may not be enforced; that some courts have gone further and held that the mere fact of prohibition renders them void and unenforceable, "but this construction is not supported by the weight of authority." He further says:

"The better opinion is that where the charter of a corporation or some other statute prohibits it from lending money on certain kinds of security, but does not declare that prohibited securities taken by it shall be void, they are not void, and may be enforced by it. The taking of such security is a misuser of the powers conferred upon the corporation by its charter, for which the state may enforce a forfeiture, but the mis-

user cannot be set up by the borrower to prevent the corporation from enforcing the security.''

We think the nature of the complainant corporation and the purposes for which it was organized were such that the power to loan its money upon security must be necessarily implied; that at any rate the making of such a loan was at the most a mere abuse of power which it possessed rather than the exercise of a power wholly beyond the objects for which it was formed. In the former case the contract would be legal and enforceable, and in the other case, under the rule laid down in *Rector v. Hartford Deposit Co.,* 190 Ill. 380, defendants would be without standing to insist that it was ultra vires. For a court of equity to hold that a corporation organized for fraternal and benevolent purposes cannot recover money which it has loaned in order to conserve the same for the benefit of widows and orphans of its deceased members, would have the moral quality of licensing piracy on the high seas to which this court cannot give its approval.

A further contention is made by defendants that the loan of the complainant to its subordinate lodge is in effect a loan to itself, and it therefore cannot be enforced to the injury of creditors. In view of the circumstances which we have already related showing that these defendants who complain were parties to the transaction of making the loan, we think this contention can hardly be given serious consideration. The subordinate lodge was duly incorporated and is a distinct organization, and its identity from a legal standpoint cannot be said to be merged in that of the parent organization. It would be as reasonable to hold that the existence of a local religious organization was merged in that of the general denominational organization to which it is subject.

The decree is affirmed.

*Affirmed.*

O'CONNOR and McSURELY, JJ., concur.